**GREENSPUN et al. v. GREENSPUN.**

No. 14742.

Court of Civil Appeals of Texas.
Fort Worth.

March 22, 1946.

Rehearing Denied May 3, 1946.

Blakley & Armstrong and James H. Walker, all of Dallas, and R. V. Nichols, of Fort Worth, for appellants.

Walter B. Scott, Joe F. Orr, and H. S. Lattimore, all of Fort Worth, for appellee.

McDONALD, Chief Justice.

This appeal is from a judgment in favor of Max Greenspun, the appellee, for approximately $191,000. The suit is based upon a claim that appellee owned 500 shares of stock in a corporation bearing the name of Parker Browne Company, and that appellants wrongfully appropriated large amounts of money and property belonging to the company. The first question to be determined is whether appellee owned the 500 shares of stock in question.

Prior to the date when appellee allegedly acquired his 500 shares of stock, the appellant Morris Greenspun, a brother of appellee, had acquired all of the outstanding stock of the company from the other stockholders. The capital stock consisted of 7500 shares of the par value of $10 each, but only 6610 shares were issued and outstanding. Appellee's claim is that in the year 1918, when Morris owned all of the stock in the company, the latter decided to make a trip to Europe, and that before leaving he appointed Max as general manager of the company at the agreed salary of $500 per month, and also told Max that he should receive some stock in the company for his services. It is clear, however, that Morris and Max had no agreement at that time as to the amount of stock which Max should receive. On December 9, 1920, there was held a meeting of the stockholders, the minutes of which recite that all of the stockholders were present, and which also recite that Morris held 6100 shares of the stock, that Max held 500 shares, and that J. M. Greenspun held 10 shares. This suit does not involve the 10 shares recited to have been held by J. M. Greenspun.

The jury found in response to special issues that the statement in said minutes that Max held 500 shares of stock was caused to be made therein by Morris; that such statement was made with "the intent of Morris Greenspun that Max Greenspun should be the real owner of such stock"; that Max accepted such ownership; and that "such entry in the Minutes of December 9, 1920, was made to compensate Max Greenspun for services rendered and to be rendered to

Morris Greenspun and Parker Browne Co., Inc."

By appropriate points of error we are called on to decide whether there is evidence of probative value supporting the jury findings; whether the facts found by the jury were sufficient to invest Max with ownership of the 500 shares; and whether there was a proper submission of the matter to the jury.

 In our first undertaking, to decide whether the evidence supports the verdict, we shall be mindful of the rule which requires us to consider the evidence and the inferences properly to be drawn therefrom in the light most favorable tó the party who obtained the verdict, treating as true the testimony which tends to support the verdict, and disregarding that which is to the contrary. 3 Tex.Jur., Sec. 745, pp. 1057-1059. From the viewpoint thus assumed, we find evidence sufficient to show the following facts:

On several occasions prior to December 9, 1920, Morris told Max either that he would receive stock in the company, or that he already had stock in the company. Morris remained in Europe for more than a year, returning to Fort Worth in 1920. Morris then planned a second trip to Europe. He testified that he had been operating the business as if it had belonged to him individually, rather than to the corporation, but that he desired, to quote his words, to "operate it corporate style." He instructed the company attorney to take such steps as were necessary to make the business "corporate style." Morris and Max met in the attorney's office on December 9, 1920. The copy of such by-laws as the company may have had were lost, or at least could not be found, so it was decided that new by-laws should be prepared and adopted. Minutes of the stockholders' meeting were prepared by the company attorney. The attorney inquired of Morris as to the amount of stock owned by Max, and was told by Morris that Max owned $5,000 worth of stock in the company. It is obvious from the record as a whole that Morris was speaking in terms of par value of the stock. The minutes were signed by Max as acting secretary, were placed in the permanent records of the company, and were still in the permanent records of the company at the time of trial. The minutes begin by reciting that a special meeting of the stockholders was held at the office of the company, describing the time and place, pursuant to call of the president. They next recite that the meeting was called to order by the president, Morris Greenspun, and that Max, by agreement, acted as secretary of the meeting. They then recite as follows:

"The following stockholders were present in person, the number of shares held by each being set opposite his name:

"Morris Greenspun...........6100 shares
"Max Greenspun.............. 500 shares
"J. M. Greenspun ............ 10 shares

"The number of shares of stock so represented in person aggregated sixty-six hundred ten shares, being the total amount of the capital stock of the company issued and outstanding."

The minutes then recite that there is a necessity for proper by-laws for the direction and management of the company, and then recite the adoption of the by-laws which are incorporated in the minutes.

The minutes recite the election of Morris, Max and J. M. Greenspun as directors. Throughout the minutes the stockholders are referred to in plural terms. The minutes are signed by Max as acting secretary.

Morris testified without contradiction that J. M. Greenspun was only the nominal owner of the ten shares described as being held by the latter, and that they actually belonged to Morris. Morris stoutly maintained throughout the trial that he and he alone owned all of the stock of the company from 1918 until the time of the dissolution of the corporation in 1941. It is in the nature of an understatement to say that his testimony contradicted in many respects the testimony given by Max.

 It seems fairly plain to us that there is evidence, treating it in the light most favorable to the verdict, sufficient to support the findings of the jury. It now remains to be decided whether the facts found by the jury were sufficient in law to invest in Max, on December 9, 1920, the present ownership

of the 500 shares of stock. The situation is somewhat analogous to that presented in Yeaman v. Galveston City Co., 106 Tex. 389, 167 S.W. 710, Ann.Cas.1917E, 191, where the Supreme Court said that it must first determine whether Robert Triplett, the alleged stockholder in that case, occupied the status of a stockholder, or whether he was invested only with such rights as entitled him to become a stockholder. So here, we must decide whether Max became the owner of the stock by reason of the happenings of December 9, 1920, as found by the jury. Unless he became actually the owner of the stock at that time, then any claim he might have asserted became barred by limitation long before this suit was filed. Appellants argue with vigor that at no time was there an agreement to give Max a definite amount of stock, and that there was no agreement as to how long Max would have to serve as general manager before becoming entitled to the stock. With these contentions we agree, but it is not upon an executory agreement to transfer stock that Max founds his suit. He alleges that he became the owner of the stock in December of 1920. It is clear that Max seeks to prove that there was an executed transfer of ownership to him of the 500 shares at that time. As we have said, the recovery cannot be sustained unless the proof shows that he became the owner of the stock at that time.

It might be said that a rule of conveyancing is involved. Was there a sufficient conveyance of the stock from Morris to Max? It is undenied that no certificates of stock were endorsed or delivered to Max, and that no new certificates were issued to him. There was no written conveyance of the stock, unless the entry in the minutes could be called such. If title to the stock ever passed, it must have passed at the time of the stockholders' meeting on December 9, 1920.

■ Beginning at page 114, Section 341, Vol. 2, Hildebrand, Texas Corporations, will be found a discussion, and citations of many authorities, pertaining to transfers of shares of stock. See also 13 Am.Jur., p. 406 et seq., 18 C.J.S., Corporations, § 388, p. 918 et seq., and 10 Tex.Jur., p. 813 et seq. Study of the decisions of the courts is rendered difficult by reason of the differences in the various situations in which the question of sufficiency of a transfer may arise. In one kind of case the rights of innocent purchasers of stock may be involved. In another there may be involved the right of the corporation to be protected from conflicting claims as to ownership of stock. In other cases rights of attaching or execution creditors may have to be determined. It seems reasonably clear from the texts and the decisions that less formality will be required in the transfer where the controversy is between transferor and transferee than in any other case. As between transferor and transferee, it seems to be the rule that transfer of title may take place though there is no delivery of the certificates themselves, nor endorsement of them, nor transfer of them on the books of the corporation, and even though the sale be by parol. In each case the inquiry is whether the minds of transferor and transferee met, whether there was an intention that the stock should then and there be vested in the transferee, and whether there were acts in the nature of a symbolical delivery of the property. In this latter connection it is to be remembered that the certificates of stock are not in themselves property, but are only evidence of the interest of the stockholder in the corporation. It is possible under some circumstances for one to own stock in a corporation though no certificate has been issued to him or endorsed or delivered to him, and likewise it is possible under some circumstances for title to the stock to pass without delivery of the certificate of stock or without written assignment of it.

■ In the present case Morris Greenspun was sole owner of all outstanding stock of the corporation and was in sole control of its affairs when the stockholders' meeting of December 9, 1920, was convened. The meeting was called for the serious purpose of adopting by-laws for the direction and management of the corporation. A stockholders' meeting is customarily an important occasion. There had been discussions between Morris and Max concerning a transfer of stock to Max in part consideration for his services as general manager. As the minutes were being

prepared, Morris was called on to state the amount of stock owned by Max. According to the jury verdict, Morris caused to be made in the minutes the statement relative to the stock held by Max, with the intent that Max should be the owner of the stock, and for the purpose of compensating Max for his services as general manager. And, according to the verdict, Max accepted the ownership of the stock. Under the particular circumstances of this case, and especially in view of the fact of Morris' sole ownership of all the stock in the corporation and the degree of his control of the affairs of the corporation, we believe that the happenings described were sufficient in law to vest ownership of the stock in Max.

Under their sixteenth point appellants appear to challenge the sufficiency of the evidence to support the jury findings above discussed. If such is the complaint made in the point, we overrule it in view of what is said above.

Under the seventh point of error complaint is made of the failure of the court to submit issues concerning the transfer of the stock to Max. Appellants did not request the submission of any special issues in this respect, but objected to the issues which were submitted on the ground that they were not ultimate issues of fact. Appellants' objections to the charge are not easy to interpret, but if we have correctly analyzed them, they are to the effect that issues should have been submitted inquiring whether there was a meeting of the minds of the parties and the passing of a valuable consideration. As against such objection it seems to us that the issues submitted by the court were enough to elicit findings as to the very matters referred to in appellants' objections to the charge. The issues inquired, respectively, whether Morris caused the minute entry to be made with intent that Max should be the owner of the stock, whether Max accepted the ownership of the stock, and whether the entry was made to compensate Max for his services rendered and to be rendered. There is no effort to set the sale aside on any ground of failure of consideration. It is not material whether the parties had an enforceable agreement about the stock prior to the time the transfer was made. It is sufficient if

they had a meeting of the minds at the time of the transfer.

Appellants urge that Morris claimed the stock allegedly transferred to Max at all times from and after December 9, 1920, and that Morris' claim thereto ripened into a title by limitation.

We cannot sustain this contention. We simply do not find anything in the record to support a claim based on any theory of adverse possession by Morris of the stock which had been transferred to Max. The record does not present a case of conversion of the stock in question.

In 1941, and more than two years before the filing of this suit, Morris caused to be filed with the Secretary of State of Texas an application for dissolution of the corporation. Morris promptly took possession of all the assets of the business, and later incorporated the business under a different name. The jury found the value of the assets of the corporation, at the time of its dissolution, to be the sum of $750,000. Included in the judgment was a recovery in favor of Max for 500/6610ths of the $750,000, the theory of recovery apparently being that Morris had converted to his own use, upon dissolution of the corporation, the undivided interest in assets which Max became entitled to on its dissolution. Appellants urge that this claim was barred by the two year statute of limitations when the suit was filed.

The case, as we have said, is not one for conversion by Morris of the corporate stock owned by Max. The suit is, in part, for the conversion by Morris of property in which Max owned an interest after the dissolution of the corporation. More than a hundred special issues were submitted to the jury. Many of them pertained to discovery, or not, by Max of the conversion by Morris of the assets of this business. The findings were favorable to Max. Applicable, as we see it, is the rule that fraud will prevent the running of limitations until the fraud is discovered or could be discovered by the exercise of reasonable diligence. Again examining the evidence in the light most favorable to the verdict, we find that it is sufficient to support the verdict in this respect. Max testified that he did not know

of the dissolution of the corporation until during the year 1944. Morris was president of the corporation and the owner of the greater part of its stock. From all outward appearances the business was conducted after the dissolution of the corporation, and after the formation of the second corporation as it had been conducted for many years. Max had no title to any of the assets of the corporation, nor any right to possession of them, so long as the corporation continued in existence. It was only after the dissolution of the corporation that Max became the owner of an individual interest in the properties of the corporation, and even then he and Morris were tenants in common. Morris' possession could not be regarded as adverse until and if he brought notice to Max of a repudiation of the latter's interest in the property. We do not have to weigh the evidence in the manner the jury was called on to weigh it; we only have to find whether there was some evidence of probative force tending to support the verdict.

 Parker Browne Company was engaged, in part, in the manufacture and sale of liquid carbonic gas. This gas was packed for sale in metal drums, or cylinders. The proof shows that prior to the year 1918 several persons in Fort Worth jointly owned a large number of these cylinders, and rented them to Parker Browne Company. During the years leading up to 1918 Morris gradually acquired the stock of all the other stockholders of Parker Browne Company, and during the same time gradually purchased the interests of the various joint owners of the cylinders, so that by 1918 he had become the owner of all the stock in the company, and also the sole owner of the cylinders. In 1918 he decided to sell the cylinders to Parker Browne Company, and did so for approximately $56,000. In 1919 he undertook to effect a sale from the corporation to himself of the cylinders at the same price. From and after that time Morris claimed ownership of the cylinders, and collected several hundred thousand dollars from the corporation as rentals. Max charges that the attempted sale of the cylinders from the corporation to Morris was void, that the corporation remained the owner of the cylinders, and that the so-

called rentals paid to Morris should be treated as wrongful withdrawals of funds from the corporation. In a manner not necessary here to describe, O. A. Brightwell, as a trustee for certain persons, collected a portion of the cylinder rentals, and it is by reason of that fact that he was sued and judgment was rendered against him.

There is no effort to establish that the cylinders were worth more than the price paid by Morris to the corporation at the time he repurchased them from the corporation. Max must recover, if at all, on the theory that the sale was entirely void, or that it did not take place.

Max was general manager of the business at the time of the repurchase, or attempted repurchase, of the cylinders by Morris. He knew about the transaction. Max made many of the entries in the corporation books setting up credits in favor of Morris for cylinder rentals, and knew about the matter when he acquired the 500 shares of stock in December of 1920. When Morris repurchased the cylinders from the corporation he owned all of the outstanding stock in the corporation. Under such circumstances there could have been no fraud in the sale as against other stockholders because there were no other stockholders. The records of the corporation contain minutes of a purported directors' meeting authorizing the sale of the cylinders to Morris, and those minutes are signed by Max as acting secretary. The suit for cylinder rentals is equitable in its nature, being for an accounting. We cannot see how the plaintiff, twenty-five years after the date of this transaction in which he actively participated, and against which he made no protest, and which he ratified by helping to carry into effect, can now maintain a suit based upon the theory that the transaction was void. Nor could he sue to set aside the sale on the ground that it was voidable. See Davis v. Nueces Valley Irr. Co., 103 Tex. 243, 126 S.W. 4; Conrads v. Kasch, Tex.Civ.App., 26 S.W.2d 732, writ refused, Kasch v. Conrads, 119 Tex. 449, 31 S.W.2d 630; Hildebrand, Texas Corporations, Vol. 3, Section 703, p. 82; Ten Eyck v. Pontiac, O. & P. A. R. Co., 74 Mich. 226, 41 N.W. 905, 3 L.R.A. 378, 16 Am.St.Rep. 633. Under elemental

principles of waiver, of ratification, of estoppel, and of laches and limitations, we must hold that plaintiff is not in position here to complain of the sale of the cylinders to Morris, or of the payment of cylinder rentals to him. Other questions relating to this transaction are discussed in the briefs, but what we have said requires reversal of this portion of the judgment.

During the years following December of 1920 large amounts of money were withdrawn from the company by Morris, and the evidence also shows that large amounts were from time to time paid from Morris' personal funds to the company. Morris' testimony was to the effect that he owned all of the stock of the company, that he considered himself as the sole owner of the business, and that he withdrew funds from the business when he wished, and in turn paid personal funds into the business when he wished, all on the theory that it was all his money whether in his personal possession or in the possession of the company. So far as the record before us shows, the books of the corporation showed all of such withdrawals and all payments of money by Morris to the company. The following issue was submitted to the jury and answered by the jury as shown:

"What amount of money do you find from a preponderance of the evidence Morris Greenspun withdrew (if any) from Parker Browne Company in the years 1921 to December 28, 1941, which was over and above and in addition to salary, expenses, sums returned to the corporation, and sums claimed by defendants as rentals on drums? Answer: $600,000.00."

We have searched in vain for any evidence supporting this finding. The only witness to testify concerning the amounts involved was the secretary of the company, who, from the books produced at the trial of the case, testified that the company books showed that the company was actually indebted to Morris, after taking into consideration the items mentioned in the issue. Appellee seems to argue in his brief that the jury may have disbelieved the testimony concerning some of the credits in favor of Morris as shown on the books. Since the books appear to have been the only basis of the testimony concerning the matter, we cannot see that the jury would have been justified in believing that some of the book entries were correct, and that other entries were incorrect. This is not a case where an effort was made to disprove some of the entries by other evidence. Nor, we think, was the case submitted to the jury on the theory that some of the book entries were not valid. This portion of the judgment must be reversed.

■ Morris urges that the undisputed evidence shows as a matter of law that the claim based on such withdrawals of funds from the company is barred by limitation. The jury found that Max could not have discovered the fact of such withdrawals by the exercise of reasonable diligence. Morris especially urges that Max knew of the withdrawals which took place prior to 1926, during the time Max was general manager, and that his knowledge of Morris' practice of making such withdrawals was sufficient to impose upon him the duty of making inquiry after 1926. We think that the question was one for the jury to decide. Accepting Morris' explanation of the withdrawals, then it was a case of Morris and the corporation borrowing from and lending to each other, and it should be assumed that Morris' payments to the corporation were applied to the oldest withdrawals, which would result in repayment of all withdrawals made while Max was with the company. The company books, had Max examined them at any given time, might have shown that Morris was not indebted to the company. We have pointed out that the company books showed no indebtedness from Morris at the time of the trial. Under such circumstances we would not be justified in holding that the evidence shows as a matter of law that Max would have discovered the alleged misapplication of corporate funds by the exercise of reasonable diligence. In other words, the evidence was sufficient to support the findings of the jury.

The judgment is for recovery of three items: (1) A proportionate part of the value of the assets of the corporation converted by Morris after its dissolution. (2) A proportionate part of the cylinder rent-

als paid to Morris and to Brightwell. (3) A proportionate part of the alleged wrongful withdrawals of money by Morris from the corporation. We have held that there is no evidence to support the second and third items of recovery just mentioned. Other points of error are presented in appellants' brief under which it is urged that the judgment should be reversed.

█ Appellants assert that there is no competent evidence showing the market value of the assets of the company at the time of its dissolution. The jury found the value of such assets to be $750,000. Max testified that he knew the reasonable value of the assets of the company, including goodwill. He appraised the physical assets at $750,000 and the goodwill at $250,000. When pressed on cross-examination he said that in arriving at the value of $750,000, he was relying on a recent report of the Dun & Bradstreet agency wherein the physical assets were shown to be worth $750,000, and that he used this as a basis, and that in addition he took into consideration the fact that Morris had taken two million dollars from the company in twenty years time and that the company should therefore be worth a million dollars. He also said that he included the value of the cylinders in arriving at the total of $750,000, and that he valued the cylinders at $300,000. In view of our holding, above announced, concerning the ownership of the cylinders, it is apparent that the inclusion of the cylinders in the valuation of the corporate assets served to destroy the probative value of the appraisal by Max of the corporate assets. Also, it is equally apparent that his valuation based on the Dun & Bradstreet report was hearsay in character. A valuation of the assets as of the time of the dissolution of the corporation could not be based solely upon the amount of money which Morris had withdrawn during the twenty years preceding. The problem before us is not unlike that in Traders & General Ins. Co. v. Jones, Tex.Civ.App., 160 S.W.2d 569, decided by this court, and affirmed by the Supreme Court in an opinion reported in Jones v. Traders & General Ins. Co., 140 Tex. 599, 169 S.W.2d 160. There it was held the statement of an expert witness given on cross-examination as

to the basis of his opinion given on direct examination, became part of his opinion, and could be looked to by the court in determining whether the opinion had any probative value. So it is here. When we examine the basis of the opinion of value offered by Max, we find that the opinion has no probative value. In any event his valuation would have to be discounted by the value which he put upon the cylinders, which would reduce the valuation of the assets of the company to $450,000. At one point in the testimony of the secretary of the company he stated that for purposes of calculating certain federal taxes the company had declared the value of the assets of the company as being between one-half and three-quarters of a million dollars. When all the testimony relating to this matter is examined it cannot be accepted as evidence of probative value of the assets at the time of the dissolution of the corporation. The secretary testified that the assets of the company at the time of its dissolution were carried on the books at the figure of $307,861.23, and that the obligations of the company at such time amounted to $135,256.44. If we be in error in saying that there is no evidence of probative value to support the jury finding in question, then we hold that the evidence is of such unsatisfactory character that we should exercise the discretion vested in us to set aside the verdict and order a new trial.

Other points of error are urged which we shall not undertake to pass upon in view of what is said above.

The judgment of the trial court in so far as it awards a recovery on account of cylinder rentals paid to Morris Greenspun and to Brightwell as trustee is reversed and here rendered in favor of appellants.

In all other respects the judgment is reversed and the cause is remanded for a new trial not inconsistent with this opinion on all issues in said cause except those pertaining to the aforesaid cylinder rentals.

On Motion for Rehearing.

█ Appellant Morris Greenspun and appellee Max Greenspun both have filed motions for rehearing. Appellee urges, among other things, that we affirm the

judgment of the trial court in so far as it adjudges appellee to be the owner of the 500 shares of stock in question, and that, if we remand the case at all, we do so for trial only on the damage issues. This we did not and cannot do in view of such cases as Phoenix Assurance Co. of London v. Stobaugh, 127 Tex. 308, 94 S.W.2d 428; Texas Employers' Ins. Ass'n v. Lightfoot, 139 Tex. 304, 162 S.W.2d 929; and Neyland v. Brown, 141 Tex. 253, 170 S.W.2d 207, 172 S.W.2d 89, because to do so would be to sanction a trial by piecemeal of an indivisible cause of action. Reference is made especially to the opinion in the Stobaugh case for a full discussion of the question involved.

The motions for rehearing of both parties are overruled.