**GREENSPUN v. GREENSPUN.**

No. 14937.

Court of Civil Appeals of Texas.
Fort Worth.

April 30, 1948.

Rehearing Denied June 11, 1948.

R. V. Nichols, of Fort Worth, and James H. Walker, Blakley & Armstrong, and Hoyet A. Armstrong, all of Dallas, for appellant.

Walter B. Scott, Hal S. Lattimore, and Joe F. Orr, all of Fort Worth, for appellee.

SPEER, Justice.

Plaintiff, Max Greenspun, sued his brother, defendant, Morris Greenspun, seeking to establish his ownership of 500 shares of the capital stock of Parker-Browne Company, a corporation. He sought recovery as against defendant individually and as trustee of the assets of the corporation embraced within three classes or types of obligations by defendant. Briefly stated, they were (1) plaintiff's proportionate part as holder of 500 shares of the capital stock, in the value of the assets of the corporation, which defendant had in 1941, without plaintiff's knowledge or consent, caused to be dissolved, and had the assets of the corporation transferred to him and thereafter in 1942 organized and had chartered a new corporation, in which defendant and two nominees holding only qualifying shares claimed and had issued to them all of the stock of the newly incorporated company; (2) to recover plaintiff's proportionate part of large sums of money withdrawn from

the corporation by defendant for which withdrawals no restitution had been made, and (3) for plaintiff's proportionate part of certain purported dividends defendant had caused the directors, whom he dominated, to pay to him under a claim that he owned all the capital stock. Judgment was entered in favor of Max establishing his ownership of 500 shares of stock, for his proportionate part of the assets of the corporation; the same proportionate part of Morris' withdrawals in that form and as pretended dividends over and above his salary and commissions which had not been repaid to the corporation, and interest on both items at six per cent. per annum since August 28, 1942 to the date of the judgment. From this judgment Morris has appealed.

We shall not attempt to state in detail the pleadings of the parties, since the verdict on special issues and the judgment thereon reflect the respective contentions of each; except in a single instance which we shall later mention.

This case was before us on a former appeal (Greenspun v. Greenspun, Tex.Civ. App., 194 S.W.2d 134), at which time we reversed and rendered one phase of the judgment that was in favor of plaintiff, and reversed and remanded the remainder of the case for another trial for the reasons therein set out. The Supreme Court affirmed our holding. 198 S.W.2d 82. That part of plaintiff's alleged cause of action which we rendered against him, of course, is not involved in this appeal. The pleadings have since been amended and as we shall later demonstrate, the testimony on some phases of the case has been more completely developed.

Parker-Browne Co. was for many years a corporation, and at all times here involved had a capital stock of $75,000 divided into 7500 shares of $10 par value each. Only 6610 shares were ever issued, the remainder was held by the corporation. Prior to 1918 Morris Greenspun bought up all outstanding shares and operated the business as his own. Plaintiff, Max Greenspun, worked for the corporation in various capacities, including bookkeeper, and later as general manager.

▮ Plaintiff's contentions are that he was the owner of 500 shares of stock on December 7, 1920, as a result of a transaction had with defendant for services rendered and to be rendered to defendant, Morris Greenspun, in conducting the business.

Prior to December 7, 1920, when Max claims he became the owner of 500 shares of the capital stock of the corporation, as above indicated, Morris had purchased all outstanding stock held by a dozen or more persons, but the record shows that Morris did not thereafter have any stock certificates of the corporation issued to him, nor was there issued by the corporation to Max a certificate evidencing his claimed 500 shares. Indeed, at no time after Morris purchased the outstanding shares of stock up until the directors caused the corporation to be dissolved in 1941 was there any stock certificates of shares issued by the corporation to any one.

Morris wanted to return to Europe during 1919 and before going away put Max in charge of the business, telling him to run it the best he could; during Morris' absence he drew many drafts for large sums of money against the business and Max paid them through a local bank. When Morris returned during 1920 he stayed a while and decided to return to Europe; the bank wanted a more definite arrangement made to authorize Max to make payments for the corporation of the drafts Morris might draw. Max and Morris went to a local attorney and Morris told the attorney to draw up minutes of a meeting of the stockholders, prepare by-laws, etc., necessary to make all acts of Max legal.

The jury found upon competent evidence that Morris gave to the attorney the information placed in the minutes of December 9, 1920, among other things they recited: "The following stockholders were present in person, the number of shares held by each being set opposite his name:

"Morris Greenspun ......... 6100 shares
"Max Greenspun ............ 500 shares
"J. M. Greenspun .......... 10 shares

"The number of shares of stock so represented in person aggregated sixty-six hundred ten shares, being the total amount

of the capital stock of the company issued and outstanding."

The ten shares in the name of J. M. Greenspun belonged to Morris Greenspun and they are not in controversy here. By the verdict it was also found that by the minutes above referred to it was the intention of Morris that Max should be the real owner of 500 shares of said stock; and that Max accepted such ownership thereunder.

In his brief, Morris argues that even if Max did thus acquire title to 500 shares at that time, he, Morris, thereafter reacquired ownership by reason of "adverse holding for the requisite time." This is embraced in Morris' first point of assigned error. The jury found against his contentions in this respect, and there was evidence to support the finding.

■ Points 5 and 6 assert that whatever right plaintiff may have ever had to recover from defendant individually or as trustee as prayed for was barred by limitation when he instituted this suit. These points go to the very heart of plaintiff's asserted cause of action. It is quite obvious that because of laches and the statutes of limitation, conditions could have arisen under which Max could have lost the property represented by his stock. Plaintiff had no certificate evidencing his interest in the corporation; we think none was necessary. His interest in the corporation was measured by his ownership of stock. A certificate by the corporation is not the stock or shares or interest owned by a party but is only evidence of that interest and the interest may be otherwise proven. Yeaman v. Galveston City Co., 106 Tex. 389, 167 S.W. 710, Ann.Cas.1917 E, 191.

At the trial from which this appeal comes, Morris requested a peremptory instruction based upon the theory that Max' suit was barred by limitation. The request was denied and he makes no assignment of error upon that particular ruling. Upon the former appeal he did assign error for a similar ruling and both this and the Supreme Court overruled them in the cited opinions, supra. It seems that the evidence at both trials was substantially the same

on this point. The Supreme Court (198 S.W.2d 82 (84) ) held that in an action "like the instant one, by a stockholder of a corporation to enforce his rights as such stockholder and have an accounting, the period of limitation is four years." Citing Yeaman v. Galveston City Co., 106 Tex. 389, 167 S.W. 710, Ann.Cas.1917E, 191.

■ It is pertinent here to inquire when did the period of limitation begin to run against plaintiff's cause of action? Was it in December, 1941, when Morris, assuming to act as the owner of all the capital stock or shares in the corporation, brought about its dissolution, and had the directors, consisting of himself and two other persons who were said to hold enough of Morris' stock to qualify them as directors, convey to him all the assets of the corporation? Or was it eight months later in August, 1942, when Morris applied for and procured a charter of the new corporation the "Parker-Brown Co., the Greenspun System" and then conveyed all of the assets formerly belonging to "Parker-Browne Co." which he held under the conveyance before mentioned from Parker-Browne Co.? If the period of limitation in such cases is four years as indicated by the Supreme Court, supra, it can make no difference under which transaction Max' cause of action arose. He filed this suit August 7, 1944, well within four years from the date of either transaction. See, also 11 Tex. Jur. 31, sec. 379.

Article 1388, R.C.S., provides, among other things, that: "Upon the dissolution of a corporation * * * the president and directors or managers of the affairs of the corporation at the time of its dissolution shall be trustees of the creditors and stockholders of such corporation * * *." Morris was president of the corporation when it was dissolved. The parties at the trial apparently agreed that the dissolution took place as of the time the resolution was passed for that purpose; this is not necessarily controlling; the resolution was passed on December 26, 1941. Morris was president of the corporation when it was dissolved and as such became a trustee of the assets for all other stockholders. We think Morris could not circumvent his re-

sponsibility as such trustee by having the directors, composed of himself and two other persons voting his stock, pass · a resolution to convey to him all the assets of the corporation, and pursuant thereto execute a bill of sale and deed the next day after dissolution covering all assets to himself. If the dissolution was effective as of the date of the resolution to dissolve, then the transfer by Morris as president to himself was after the dissolution. Such acts do not impress us as a bona fide performance by a trustee of a fiducial relation when charged in the trial petition with "fraudulent and wicked intentions" in performing such acts.

It is our belief that the actual conversion of Max' interest in the assets of the original corporation took place when Morris and his wife on August 28, 1942, conveyed all the assets he had previously received (as statutory trustee) from "Parker-Browne Co." to the new corporation, this being the same day upon which the charter was issued. The judgment of the trial court indicates that this was the date of conversion since interest on the recovery began as of that date. No objection is made here by Morris of this phase of the judgment.

It is true that Morris testified throughout the trial that he never at any time agreed or intended that Max should have or own any stock and that he at all times owned all stock; whether or not there was a "meeting of their minds" on this, as contended in points 2 and 3, was determined by the verdict by competent evidence against Morris. The effect of the verdict was to find that the parties agreed at the same time upon the same thing.

At the dissolution of the corporation, Morris became a trustee for Max under the statute cited supra, whether he knew it or intended to do so or not, Peurifoy v. Wiebusch, 132 Tex. 36, 117 S.W.2d 773; this relation continued until he repudiated that trust and it was made known to Max either directly or indirectly in such way as that Max, by the exercise of necessary diligence, could or should have known of the repudiation. 28 Tex.Jur. 144, sec.

81. All points raising the question of limitation are overruled.

The fourth point of error is to the effect that reversal should be had because there is no competent evidence showing the market value of the assets of the corporation in 1941 when it was dissolved or in 1942 when the new corporation was formed. When, as in this case, the contention is made that there is *no* competent evidence to support the verdict, we may not determine whether there is *sufficient* evidence for that purpose. We must determine whether or not there is *any* evidence of probative value to support the judgment, by construing the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the verdict and judgment thereon. Wisdom v. Smith, Tex. Sup., 209 S.W.2d 164.

Assuming then from what we have said that Max was the owner of 500 shares of the stock in the corporation from and after December 9, 1920, and that he did not lose that interest by limitation prior to 1941 when the corporation was dissolved at the instance of Morris under a claim that he owned all the capital stock, it must follow that the assets of the dissolved corporation belonged to the stockholders in proportion to the amount of stock owned by each. In this action by Max against Morris for having converted all of the assets to his own use and benefit and to recover his prorata interest therein, the amount of his recovery in this respect could not be ascertained without proof and a jury finding of what the total value was, after which it becomes a matter of calculation as to the amount of Max' recovery. The jury found as a fact that the assets of the corporation at the time Morris is charged with having converted them were worth a million dollars. By the point under discussion Morris contends that there was no competent evidence to support the jury finding as to value.

In a determination of the question before us it is the settled rule that whether or not the evidence supports the verdict, the appellate court must consider the testimony and the legitimate inferences to be drawn therefrom in the light most favorable to

the party who obtained the verdict, treating as true the testimony which tends to support the verdict, and disregarding that which is to the contrary. 3 Tex.Jur. 1057-1059, sec. 745; Greenspun v. Greenspun, Tex.CivApp., 194 S.W.2d 134, affirmed, Tex.Sup., 198 S.W.2d 82. Further citation of authorities is deemed unnecessary.

■ Let us examine the testimony upon which the jury acted. Plaintiff testified in substance that he had worked for the corporation for years, that he was bookkeeper and was general manager from 1919 to 1926; in these capacities he knew the nature of the properties owned by the corporation, the nature of all its assets and was familiar with their reasonable market values; that in so far as he knew the assets in 1941 were of the same general nature and value as they were when he left in 1926; he was familiar with every detail of the business and knew the value of its assets in 1941 and 1942. That the assets of the business were of the reasonable market value of a million dollars or more at the times inquired about. Defendant Morris Greenspun's counsel objected to the testimony of Max upon the ground that he had not shown himself qualified to so testify and asked that his testimony be stricken and that counsel be permitted to take him on voir dire to further test his competency; the requests were denied by the court and counsel was told he would have an opportunity to cross examine the witness.

Max was given a vigorous cross examination as to how he fixed the values; he repeatedly reaffirmed his total estimate and enumerated many pieces of real estate and some personal property, placing values thereon, all of which aggregated something over $500,000 and added the good will of the value of $250,000 or more. He said he did not know the amount of merchandise and supplies on hand but that based upon his knowledge of the values of these items when he ran the business and the fact that the corporation was doing a much larger business in 1941 and 1942, these values would necessarily be more than when he ran it; he said all amounted to more than he had estimated the values to be. He was asked if he did not base his estimate upon a report in Dun & Bradstreet and he said that to some extent he did, because they (meaning Morris and those operating the corporation) had given to that agency the value of the physical assets at $750,000. He said that was *their* estimate to Dun & Bradstreet and not his. He also said on cross examination that in fixing his estimate on the value of the good will, any business established as this one for many years that could pay out over and above operating expenses $2,000,000 in twenty years and still have more assets than it began with was very valuable and the good will was worth $250,000 or more. He further said the business could be sold for a million dollars, and that Morris would be foolish if he took that for it. That Morris could sell the business to one that knew it for perhaps one and a half million. In arriving at the total physical assets of the corporation in 1941 when the old corporation was dissolved, Max included an item of $125,000 for bills receivable; he said he had not estimated stocks and invoices on hand but since the corporation was doing a much larger business than when he was manager these items must have been very large.

Mr. Brightwell, bookkeeper and general manager for Morris from 1926 to 1941, was called to the stand by Max' counsel and questioned about the assets of the corporation as disclosed by the books at the time of dissolution in December, 1941. He stated that the books showed there was on hand, cash and on deposit, accounts receivable, notes receivable, accrued interest, accrued rentals, unexpired insurance, cash deposits and inventories on hand, with the amount of each set opposite, aggregating $221,930. Max had only included in his estimate of values the item of "bills receiveable" of $125,000. By simple calculation the books showed in the enumerated items $96,930 more than the estimate made by Max. Brightwell also said the books showed other assets consisting of four trailer-trucks, which cost $2800 each, two passenger cars, a pick-up truck, and a one and a half-ton truck. The values of these items were not shown. Whatever the values of these trucks and automobiles were, Max did not include

in his estimate of values. It is quite apparent that there were assets worth $100,000 or more not enumerated by Max.

Brightwell also testified at length as to the volume of gas and dry ice sold during several years, varying from $169,000 in 1930 to over $300,000 during 1941 along with the profits arising therefrom. He also testified as to the real estate, building, machinery and equipment about which Max had testified. He was not asked nor did he attempt to place values on these items. Both Brightwell and Morris testified in the case and neither was asked nor did they place any value on the physical assets in 1941 or any other time. Neither of them denied having furnished to Dun & Bradstreet the valuation of physical assets at $750,000 about which Max had testified, nor did either of them contradict in any respect the values placed upon the physical assets or the "good will" by Max. They both said the business continued after the dissolution of the corporation precisely in the same manner that it had previously been operated, and that all the assets were conveyed by the corporation to Morris at its dissolution and he in turn conveyed them to the new corporation when organized in August, 1942. It is quite clear that in operating the business after the dissolution while Morris was holding all assets as a statutory trutee, it was continued in every way exactly as it had been prior to its dissolution, i. e., in the same name, manufacturing and sale of the identical products, by the same processes, under the advertised type and kind of products. This of course means utilizing every phase of the good will and confidence in the public in all that was formerly "Parker-Browne Co.," the corporation, until in August, 1942 when Morris caused the incorporation of "Parker-Browne Company, The Greenspun System," when he transferred all of the assets then held by him (as trustee) to the new corporation and had all stock issued to himself and his nominees, the latter holding only qualifying shares to enable them to act as directors. We construe all this to mean that the "good will" of the old corporation was never permitted to die or cease to exist, but was for all intents and purposes kept very much alive and at all times utilized. The good will of the old corporation was undoubtedly of much value, otherwise Morris would not have so scrupulously used it. It was a part of the assets of the corporation and was as surely converted by Morris as were the physical assets.

Upon the former appeal of this case it did not appear that Morris had furnished the valuation of $750,000 of the physical assets to Dun & Bradstreet, but that Max had based his opinion in part upon what he had seen in that publication, which, of course, under such circumstances, was hearsay; not so under this record; such testimony is in effect a declaration against interest made by the opposing party. Max testified he was familiar with all the assets, knew their utility and adaptability for the purposes used and knew the reasonable market value. His testimony as to values, whether classed as opinion or expert evidence or by an interested party, was competent to raise a jury issue. The particular basis for his idea of values as disclosed by his cross examination only affected the weight of his testimony. Missouri, K. T. R. Co. of Texas v. Murray, Tex.Civ.App., 150 S.W. 217, error refused; Fort Worth & D. C. Ry. Co. v. Hapgood, Tex.Civ.App., 210 S.W. 969; Fort Worth & D. C. Ry. Co. v. Amason, Tex.Civ.App., 239 S.W. 359; McDaniel Bros. v. Wilson, Tex.Civ. App., 70 S.W.2d 618, error refused; City of Waco v. Roberts, Tex.Civ.App. 12 S.W. 2d 263, affirmed, 121 Tex. 217, 48 S.W.2d 577. As above pointed out Max gave his estimates and opinions of the value of the assets of the corporation and testified that Morris and those acting for him had given to Dun & Bradstreet the valuation of the physical assets at $750,000. Neither Morris nor any witness in his behalf denied or contradicted the values given by Max nor did they deny having given the valuation to Dun & Bradstreet. Applicable here is the rule, "Where the proof tends to establish a fact and * * * it is within the power and to the interest of the opposing party (Morris) to disprove it, if false, the silence of the opposing party not only strengthens the probative force of the affirmative proof, but of itself is clothed with a certain probative force." Pullman Palace Car Co. v.

Nelson, 22 Tex.Civ.App. 223, 54 S.W. 624; Farmers' Guaranty State Bank v. Burrus Mill & Elevator Co., Tex.Civ.App., 207 S.W. 400; Central Motor Co. v. Roberson, Tex.Civ.App., 139 S.W.2d 287; Bailey v. Hicks, 16 Tex. 222, 227. In Aviation Credit Corporation of New York v. University Aerial Service Corporation, Tex.Civ.App. 59 S.W.2d 870, 873, where it was contended that there was *no* evidence of the value of property attached and replevied, it was held that the officer's estimate of value was *some* evidence. Citing authorities.

 Under all the facts and circumstances in this record, we are unwilling to say that there was *no* substantial evidence of the value of the corporate assets. It was of a character to raise a jury issue and will support the jury verdict. The point of error is overruled.

 Seventh point asserts error because Max recovered on an item of $25,956.38, when that item was not pleaded by him. In view of this whole record we see no merit in the contention. Max sought recovery of his prorata part of all sums withdrawn by Morris in various forms including pretended dividends under the assumption that he owned all the stock.

The judgment indicates that the item now under discussion was included in all such withdrawals above salary and commissions not repaid. It is undisputed in the evidence that in 1937 the internal revenue department was claiming a large tax and that this item was paid by the corporation to Morris as "an informal dividend" for the purpose of avoiding the claims of the Revenue Department. The jury found as a fact that Max did not know Morris had received this particular item and that Morris received and held it for the corporation.

 Eighth point claims error because the ultimate issue of the transfer of stock to Max was not submitted. Under this point Morris contends that his requested issues should have been submitted, which would have inquired if Morris "bargained, sold and transferred 500 shares of stock" to Max and if so when. The verdict under the issues submitted was that under the minutes of December 9, 1920, Max held 500 shares of stock and that Morris intended by said minutes that Max should be the real owner thereof. The requested issues involved whether or not Morris "bargained, sold and transferred" any stock to Max. Under the facts in this case there is no evidence that any stock or certificate evidencing stock or interest was ever issued or transferred to Max, and there was no necessity to restrict his ownership in stock to a sale or transfer of stock by Morris. It is equally true that no certificates of stock were ever issued to Morris after he acquired all outstanding stock but he undoubtedly owned it as did Max his 500 shares as found by the jury. The point must be overruled.

 Ninth and tenth points claim the court should have granted Morris' motion for mistrial when Max' counsel injected into the evidence the comparative wealth of the parties, and, alternatively, that we should reverse the judgment because counsel argued same. Ordinarily such complaints should be sustained, but such does not necessarily follow. In fact it is quite apparent that Max' counsel did not inject the offending evidence into the case. Morris, while testifying on cross examination, volunteered the testimony and not in response to any inquiry made. A colloquy followed and Max' counsel agreed that the voluntary statement had no place in the evidence and in commenting made certain statements about it and objections were made to his remarks and the court instructed the jury not to consider the "remarks of counsel" but did not withdraw the testimony of Morris on the subject. Max' counsel later argued to the jury the incident. We think no reversible error is shown.

Eleventh point asserts reversible error because of conflicts in the verdict. Without an elaborate analysis of all the many special issues we see no material conflict and overrule the point.

 Twelfth and final point contends Max could not recover for excessive withdrawals by Morris from the corporation because, if there were such, they belonged to the corporation and not to Max. We cannot assent to this for the reason the corporation was dissolved when this suit was

brought—it had no existence as such; the assets belonged jointly to the stockholders. Whatever property the corporation previously had was in Morris' hands as trustee for Max, the only other owner of the assets. Max was entitled to recover an amount equal to his proportionate part thereof when Morris converted all to his own use.

From what we have said we find no reversible error in this case and conclude that the judgment should be and it is affirmed.

McDONALD, C. J., dissenting.