In the Matter of the ESTATE OF Jo Ann CRAWFORD, Deceased.

Richard "Dick" MORGAN and Jean Morgan, Appellants,

v.

William E. "Bill" MORGAN, Appellee.

No. 07–89–0182–CV.

Court of Appeals of Texas, Amarillo.

Aug. 29, 1990.

Deaver & Chamberlain, John E. Chamberlain, Memphis, for appellants.

William Stoudenimire, Mobile, Ala., Williams, McCoy & Goodall, Sim W. Goodall, Memphis, Whittenburg, Whittenburg & Schachter, Susan L. Burnett, Amarillo, for appellee.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

REYNOLDS, Chief Justice.

Richard "Dick" Morgan and Jean Morgan, husband and wife, appeal from a judgment, rendered upon a directed verdict, decreeing their monetary liability to William

E. "Bill" Morgan for the conversion of the proceeds of the sale of stock bequeathed to Bill in the will of his and Dick's deceased mother. By cross-points, Bill complains of the court's direction of an adverse verdict on his other pleaded causes of action.

This appeal requires us to first decide whether, and we determine that, the state of the evidence adduced before a jury supports the court's direction of a verdict on the holding, predicated upon application of Texas Business and Commerce Code Annotated section 8.313(a) (Vernon Supp.1990), that there was no ademption of a specific legacy of stock before the testatrix's death. Having made that determination, we are required to decide whether Bill is, and we determine that he is not, entitled to further relief under his cross-points. Affirmed.

Jo Ann Crawford, the mother of Dick and Bill, granted Dick a durable power of attorney in 1983, but she continued to manage her own affairs. She executed her will on 6 January 1987 at a time when she owned both preferred and common shares of Foremost–McKesson stock. She named Dick as executor and, as material to this cause, she bequeathed all her shares of stock to Bill and her cash and certificates of deposit to Dick.

Mrs. Crawford, a resident of Hall County, was hospitalized in Amarillo on 4 March 1987. By telephone two days later, on March 6, Dick contacted Steve Pierce, a broker with the A.G. Edwards firm in Dallas, and arranged to set up a joint account in both Mrs. Crawford's name and his own to handle a sale of the preferred shares of his mother's Foremost–McKesson stock. On oral instructions from Dick and upon receipt of a joint account agreement signed by Mrs. Crawford and Dick, a backup withholding certification signed by Mrs. Crawford, and a third party release, Pierce set up the joint account and arranged for the sale of the preferred stock on the New York Stock Exchange.

On March 9, the "trade date" or "sale date," the stock was offered and accepted on the stock exchange floor at 12:45 p.m. Two days later, March 11, Pierce received the stock certificates via mail and, on March 13, they were deposited into the A.G. Edwards joint account of Jo Ann Crawford and Dick Morgan.

Mrs. Crawford died on 13 March 1987. Bill testified that she died at 2:00 a.m.; the death certificate lists the time of death as 3:00 p.m.

The settlement date was March 16, the date by which the purchaser had to tender payment for the stock. Evidence was adduced that the general practice is not to place securities in the purchaser's name until after the settlement date.

The purchase price was paid. The proceeds due the seller, more than $94,000, were remitted by a check made payable to Jo Ann Crawford and Dick Morgan. The check was received by Dick, endorsed by him as executor five days before his appointment, and the proceeds were deposited in his personal account. There is evidence, and Bill alleged, that Dick and Jean used the proceeds for their own purposes.

Although Dick, as executor, filed an inventory showing the Foremost–McKesson stock was owned by Mrs. Crawford on the date of her death, he disallowed Bill's claim to the stock proceeds, maintaining that the preferred stock was not a part of the estate to be distributed to Bill. Bill sued Dick, and later Jean, alleging their breach of fiduciary duty, fraud, bad faith, conversion, conspiracy, and tortious interference with inheritance rights, and seeking damages and the imposition of a constructive trust.

In prosecuting his causes of action, Bill adduced evidence which, he represents, raised the issues of fraud on the part of Dick, and his necessary incurrence of attorney's fees in bringing the actions. By his calculations, Bill figured that he was entitled to, and he was claiming, the amount of $88,445.

Upon presentation of evidence by both sides, the trial court, finding that the shares of preferred stock were a part of the deceased's estate on the date of her death and that an ademption was not shown, withdrew the case from the jury and directed a verdict. The court rendered judgment on Bill's cause of action for con-

version, decreeing his recovery of $87,-643.81 with interest, but adjudged that he failed to establish a prima facia case on his other alleged causes of action.

By a single point of error, Dick and Jean challenge the court's direction of a verdict on the ground that the stock was not adeemed. They contend ownership of the stock passed to the purchaser on the "sale date" by operation of the doctrine of equitable assignment, resulting in disposition of the subject of the legacy before the testatrix's death and ademption of the legacy. Bill answers in support of the trial court's ruling on his action of conversion, but charges, in six cross-points, the court with an abuse of discretion by its rendition of a directed verdict against him on his other six actions.

Initially, we note that the trial court cited and relied "upon Section 8.1313, specifically sub-section (2) and (3) of the Uniform Commercial Code," as the basis for its decision. However, the parties agree that the court intended to cite those subsections of the Uniform Commercial Code as incorporated into section 8.313(a)(2) and (3) of the Texas Business & Commerce Code Annotated (Vernon Supp.1990), the sections of which will be referred to only by their numbers.

■ Subsection (2) of section 8.313(a) is expressly limited in application to uncertificated securities. The record clearly demonstrates that a certificated security is the subject of this litigation. Therefore, subsection (2) cannot form the basis for the trial court's ruling. Nevertheless, the court's erroneous conclusion of law, without more, would not require reversal of an otherwise correct judgment. *Andrews v. Key,* 77 Tex. 35, 13 S.W. 640, 642 (1890); *Able v. Able,* 725 S.W.2d 778, 780 (Tex.App. —Houston [14th Dist.] 1987, writ ref'd n.r. e.).

■ A plaintiff is entitled to a directed verdict if he has conclusively proven the elements of his cause of action, that is, when reasonable minds can draw only one conclusion from the evidence. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). Therefore, in reviewing the record, we will consider the evidence in the light most fa-

vorable to the party against whom the verdict was directed and discard all contrary evidence and inferences, *id.,* to determine if Bill has produced evidence conclusively demonstrating the absence of a disposition of the stock during the lifetime of the testatrix. *Shriner's Hospital for Crippled Children of Texas v. Stahl,* 610 S.W.2d 147, 148 (Tex.1980).

■ Since much of the evidence involved is circumstantial in nature, we note that an inference of fact cannot be based upon other inferences. To do so, would violate the rule of *Joske v. Irvine,* 91 Tex. 574, 44 S.W. 1059 (1898), which requires proof of a vital fact by evidence amounting to more than a mere scintilla. *Schlumberger Well Sur. Corp. v. Nortex Oil & G. Corp.,* 435 S.W.2d 854, 858 (Tex.1968). However, even evidence from an interested witness should be taken as true as a matter of law where that testimony is clear, direct and positive, with no circumstances in the evidence tending to discredit or impeach it, and where the opposite party has had the means and opportunity to disprove it, if it is untrue, and has failed to do so. *James T. Taylor, Etc. v. Arlington Ind. School Dist.,* 160 Tex. 617, 335 S.W.2d 371, 376 (1960).

■ A stock certificate is not, itself, stock in a corporation; it is a muniment of title which evinces ownership of such stock. *Yeaman v. Galveston City Co.,* 106 Tex. 389, 167 S.W. 710, 720 (1914); *Estate of Bridges v. Mosebrook,* 662 S.W.2d 116, 120 (Tex.App.—Fort Worth 1983, writ ref'd n.r. e.). Nor is all stock ownership evinced by certificate. Tex.Bus. & Comm.Code Ann. § 8.102(a)(2) (Vernon Supp.1990). Complete ownership of certificated stock may exist without the issuance of a certificate, *Yeaman v. Galveston City Co.,* 167 S.W. at 720; *Greenspun v. Greenspun,* 194 S.W.2d 134 (Tex.Civ.App.—Fort Worth), *aff'd,* 145 Tex. 374, 198 S.W.2d 82 (1946), or its delivery. *Estate of Bridges v. Mosebrook,* 662 S.W.2d at 121.

Section 8.313 sets out the formalities of transfer of a security. The formalities are used to identify the moment of transfer to

the purchaser and thereby to define the moment when the rights of third party claimants against purchasers and financial intermediaries are terminated by rendering notice of such adverse claim ineffective. Sec. 8.313(c); *see also* U.C.C. § 8–313 comment 1 (1962).

■ If, at the instant after Mrs. Crawford's death, a third party creditor could have given effective notice of an adverse claim against the stock, then that stock was still in Mrs. Crawford's estate and amendable to Bill's claim against the estate. *Shriner's Hospital, Etc. v. Stahl*, 610 S.W.2d at 150. Alternatively, if the transfer of stock was complete at her death, the stock was beyond the reach of her creditors and Bill's claim because it was no longer a part of her estate. *See Sinnott v. Gidney*, 159 Tex. 366, 322 S.W.2d 507, 511 (1959). In such instance, the legacy of the stock would be adeemed by disposition. *Shriner's Hospital, Etc. v. Stahl*, 610 S.W.2d at 148.

Dick and Jean cite *Greenspun v. Greenspun*, 194 S.W.2d at 134, and the official comments to section 8.313's counterpart in the Uniform Commercial Code to argue that section 8.313 applies solely to the transfer of legal title and does not affect the transfer of equitable ownership between parties to a sale of securities. However, the current dispute does not involve equity between parties to a sale; rather, it involves the rights of a third party outside the sale.

As the *Greenspun* court explained, its conclusion that the formal requirements of transfer may be relaxed by equity was expressly confined to situations where the controversy under consideration was between transferor and transferee. 194 S.W.2d at 137. The argument that there was a *Greenspun* "meeting of the minds" between Mrs. Crawford and the purchaser which produced an equitable assignment of ownership does not address the rights of Bill as a third party claimant. Cases cited from other jurisdictions concerning disputes between parties to a gift or other transaction are similarly unhelpful. Where the issue is one of third-party rights in stock disposed of by sale, the formalities of transfer serve as an indispensable means of determining when those rights terminate.

Section 8.313(a) contains a total of ten subsections, each containing alternative formalities marking the completion of transfer. To support the judgment in favor of Bill, the record must demonstrate conclusively that none of the formalities of transfer were completed.

Subsections (2) and (6) relate only to uncertificated securities. Dick's testimony of going to Memphis, obtaining the certificates, and later helping his mother sign them, together with the A.G. Edwards securities receipt showing the certificate numbers of the transaction, prove the certificated nature of the securities. Therefore, these subsections are not pertinent to the transaction.

Similarly, subsections (8), (9), and (10) apply to the transfer of investment securities which have been made collateral for an obligation of the holder. There is no suggestion in the record that the securities collateralized an obligation; instead, the record reveals that the entire proceeds from the sale of the securities, less the broker's charges, were remitted to Jo Ann Crawford and Dick Morgan, which demonstrates that no security interest had been given in these investment securities. Consequently, these subsections have no application to the transaction.

Subsection (1) defines completion of the transfer of stock as possession of the certificated security by the purchaser or his designee. The uncontroverted deposition testimony of Steve Pierce, the broker who conducted the sale for Dick, conclusively demonstrates that subsection (1) requisites were not met.

Pierce testified that he received the certificates of stock on March 11th. If he, as a stock broker, were considered to be in possession of the certificates, he held them as a financial intermediary pursuant to section 8.313(d), thereby rendering subsection (1) inapplicable. Further, A.G. Edwards' records show that on March 13, the day of Mrs. Crawford's death, the stock was de-

posited into account number 55 475–253, the joint account of Jo Ann Crawford and Dick Morgan. Pierce also testified that stock is placed in the buyer's name after the settlement date if the buyer so instructs. In the absence of controverting evidence, it is a permissible inference that the usual practice was not varied in the instant transfer. Therefore, reasonable minds cannot differ in concluding the purchaser had not obtained possession of the certificated securities by the time of Mrs. Crawford's death.

Subsection (3) defines completion of transfer as possession by a financial intermediary of certificated securities "specially indorsed to or issued in the name of the purchaser." Even though A.G. Edwards qualified as a financial intermediary as defined in section 8.313(d), there is no contention or evidential indication that the stock certificates were specially endorsed to or issued in the name of the purchaser. Indeed, the facts demonstrate that they could not have been.

Dick brought the stock certificates to Amarillo "around noon," which he estimated as "11:30–11:00, 12:00" on March 9, and went to the hospital, where he had to help Mrs. Crawford sign the certificates. He mailed the certificates to Pierce and afterwards, perhaps sometime that evening, he called Pierce. Since the stock was sold at 12:45 p.m. on that day and the certificates were signed and placed in the mail before any contact with the broker regarding the sale, the unknown identity of the purchaser precluded a special indorsement on the certificates. Moreover, absent other instructions, which are not evidenced, the stock would not be placed in the buyer's name until after the settlement date. Thus, reasonable minds could only conclude that the certificates had been neither indorsed to nor issued in the name of the purchaser at the time of Mrs. Crawford's death. Therefore, there was no completion of transfer within the meaning of subsection (3).

A subsection (4) completion of transfer occurs when the financial intermediary sends confirmation of the sale to the purchaser and in some way identifies the securities as belonging to the purchaser, as by making a book entry. The record contains two confirmations of sale, requesting remittance of the purchase amounts, which might be presumed to have been sent to the purchaser. But if so, there is no indication, by book entry or otherwise, of any identification of the securities as belonging to the purchaser. The notation "sold" on the A.G. Edwards securities receipt is, without more, insufficient to identify the securities as belonging to a specific purchaser. In the absence of such identification, no transfer was completed under this subsection.

Subsection (5) applies to a situation in which the certificates are in the possession of a third party who is not a financial intermediary and is contingent upon his acknowledgment that he holds such securities for the purchaser. Again, the A.G. Edwards security receipt conclusively demonstrates the stock certificates were held by a financial intermediary, A.G. Edwards, in the joint account at the time of Mrs. Crawford's death. Plainly, subsection (5) is inapplicable.

Subsection (7) requires a transfer of certificated securities to be shown by appropriate entries on the books of a clearing corporation, as defined in section 8.102(c), pursuant to section 8.320. There is, however, no indication that a clearing corporation was utilized in this transaction; the evidence is that the certificates were being held by A.G. Edwards in the joint account. Again, in the complete absence of contrary evidence, reasonable minds cannot differ in the conclusion that the certificates were in the possession of A.G. Edwards at the time of Mrs. Crawford's death, and no subsection (7) transfer could have occurred.

The state of the evidence adduced before the jury supports the court's direction of a verdict on the holding that there was no ademption of the specific legacy of stock before the testatrix's death. Therefore, under the record before us, we overrule Dick and Jean's sole contention of error and affirm the judgment, subject to the disposition of Bill's cross-points.

By his six cross-points, Bill charges the trial court with abuse of discretion in directing a verdict against him on his causes of action for tortious interference with inheritance rights, breach of fiduciary duty, fraud, bad faith, conspiracy, and imposition of a constructive trust. As we understand Bill's live trial pleadings, each of these causes of actions, as well as the action for conversion on which the court directed a verdict for him, is founded on Dick's conversion of the proceeds from the sale of the stock which has been determined to be a part of Mrs. Crawford's estate, and which she bequeathed to Bill. Additionally, Bill alleged other unauthorized and tortious acts were committed by Dick and, in some instances, Jean in connection with the affairs of the estate. In each cause, Bill sought compensatory damages of $100,000 and exemplary damages of one million dollars. Nevertheless, insofar as we are able to discern from the brief he submitted on his cross-points, Bill's only complaint of harm stemming from the court's direction of a verdict is that he was denied the jury's "determination of the existence of punitive damages and the related issue of attorney's fees," and the imposition of a constructive trust "upon the remaining proceeds from the sale of the preferred shares and the identifiable property purchased with the proceeds."

■ Our system of pleading permits a party to state as many theories of recovery as he has, *McKenzie v. Carte*, 385 S.W.2d 520, 526 (Tex.Civ.App.—Corpus Christi 1965, writ ref'd n.r.e.); but, except for situations not present in this litigation, the party will be entitled to recover no more than the amount required for full satisfaction of his damages. *McMillen v. Klingensmith*, 467 S.W.2d 193, 196–97 (Tex.1971). Then, when the party chooses to exercise one of the theories, he abandons his right to exercise another remedy and is precluded from resorting to it. *Custom Leasing, Inc. v. Texas Bank & Tr. Co. of Dallas*, 491 S.W.2d 869, 871 (Tex.1973).

As noticed in the forepart of this opinion, Bill received a directed verdict on his cause of action for conversion. He was awarded a monetary recovery approximating the amount he sought in the trial, and he does not contend the amount was incorrect. In connection with producing the evidence entitling him to that judgment, he also presented the evidence he represents as evincing Dick's fraud and his incurrence of attorney's fees.

■ Texas has a strong public policy against conversion of property. The strength of that policy is demonstrated by the fact that exemplary damages may be recovered when the conversion is accompanied by the elements of fraud and oppression. *Castilleja v. Camero*, 414 S.W.2d 424, 428 (Tex.1967). And the public policy for exemplary damages includes, among other factors, the consideration of attorney's fees. *Hofer v. Lavender*, 679 S.W.2d 470, 474 (Tex.1984). Moreover, when one person wrongfully takes the property of another and converts it into a new form, a constructive trust arises and follows the property or its proceeds. *Hand v. Errington*, 242 S.W. 722, 724 (Tex. Comm'n App. 1922, judgm't adopted); *Pounds v. Jenkins*, 157 S.W.2d 173, 178 (Tex.Civ.App.—Texarkana 1941, no writ). *See, also, First Nat. Bank of Amarillo v. Bauert*, 622 S.W.2d 464, 466 (Tex.App.—Amarillo 1981, no writ).

■ Obviously, then, the issues of exemplary damages and the imposition of a constructive trust were raised, and should have been litigated, in Bill's cause of action for conversion. Nevertheless, Bill neither complained to the trial court, nor contends on appeal by a point or cross-point of error, that the directed verdict on his action for conversion denied him recovery on these issues so as to preserve them for appellate review. *Allright, Inc. v. Pearson*, 735 S.W.2d 240 (Tex.1987). Instead, on appeal, Bill opted to seek, and obtained, our affirmance of the judgment in his favor, thereby electing to pursue the remedy he received. *B.L. Nelson & Associates v. City of Argyle*, 535 S.W.2d 906, 910 (Tex.Civ.App.—Fort Worth 1976, writ ref'd n.r.e.). Having done so, he may not now contend on appeal that he has the right to divide his basic claim and enforce it piecemeal to effect an

additional recovery he was denied in the trial court without complaint and failed to properly preserve for appellate review. Accordingly, Bill's cross-points are over-ruled.

The judgment of the trial court is affirmed.