**In re SEMINOLE WALLS & CEILINGS CORP., Debtor.**

**Carla Musselman, Trustee, Plaintiff,**

**v.**

**Debbie Jasgur, Joseph Jasgur, Robert L. Fox, Dartlin J. Africh, Africh Maintenance, Inc., Africh Management & Investment, Inc., Vintage Partners, Inc., Bradley E. Whittle, The Funding Solutions, Inc., Joseph Yaron, PITA Corporation, Paul Philipson, Defendants.**

**Carla Musselman, Plaintiff,**

**v.**

**Africh Management & Investments, Inc., Africh Maintenance, Inc., Dartlin J. Africh, Robert L. Fox, PITA Corporation, Defendants.**

**Bankruptcy No. 6:01–bk–01966–KSJ. Adversary Nos. 6:04–ap–77, 6:04–ap–79.**

United States Bankruptcy Court, M.D. Florida, Orlando Division.

March 2, 2011.

Bradley M. Saxton, Orlando, FL, for Plaintiff Carla Musselman.

Elizabeth A. Green, Baker & Hostetler, LLP, Orlando, FL, Joel A. Goldman, Los Angeles, CA, for Defendants Debbie and Joseph Jasgur, Paul Philipson.

Roy S. Kobert, Orlando, FL, for Defendants Africh Management & Investment, Inc., Dartlin J. Africh, its Registered Agent.

Tucker H. Byrd, Frank M. Wolff, Orlando, FL, for Defendants Vintage Partners, Inc., Officer, Dir., Managing or Gen. Agent, Bradley E. Whittle, Joseph Yaron.

### AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

KAREN S. JENNEMANN, Bankruptcy Judge.

Throughout his life, Joseph Jasgur, a celebrity photographer, took thousands of photos of Hollywood stars, including the earliest professional photographs of Marilyn Monroe. But Jasgur's photographic acumen sadly never translated into any financial success, and he recently died without seeing any monetary rewards for his work, despite its apparent value. Indeed, disputes over the ownership of Jasgur's work are the primary contested issue in these two related adversary proceedings pending since 2004.

---

1. Pursuant to Bankruptcy Rule 7052, the Findings of Fact and Conclusions of Law entered February 9, 2011 (Doc. No. 451), are amended to correct inadvertent mistakes regarding the Court approved settlement agreement between Tom Endre and the Chapter 7 trustee (Doc. No. 591). Amendments appear on pages 4 and 5 that correct the Jasgur estate and Chapter 7 trustee's agreement to split the net proceeds of a sale of the Jasgur Collection (defined below) 50/50, and to allow any claim of Paul Philipson to the Collection to be paid from the Jasgur estate's portion of the net proceeds of such sale.

Now, after more than six years of litigation, multiple interim opinions,[2] and a week-long trial,[3] the Court finally can determine who owns Jasgur's life work. The primary contenders are: (1) the debtor, Seminole Walls & Ceilings Corporation ("SWC"), now administered by Carla Musselman, the Chapter 7 trustee, working in tandem with Jasgur's estate; (2) the Gail A. Williamsen Irrevocable Children's Trust; and (3) Dartlin Africh, who, through his affiliated businesses, purchased certain portions of Jasgur's work from SWC on the eve of the forced conversion of SWC's confirmed Chapter 11 case to a liquidating Chapter 7.

The Chapter 7 trustee has filed two adversary proceedings, the first to determine who owns Jasgur's work, and the second to avoid the transfer from SWC to Africh.[4] Jumping to the conclusion, the Chapter 7 trustee wins in both adversary proceedings. SWC together with Jasgur's estate owns the photos and other assets. The transfer to Africh is an avoidable fraudulent transfer under § 544(b) of the Bankruptcy Code[5] and Florida Statute § 726.105(1)(a), and the Chapter 7 trustee is entitled to return of the assets under § 550 of the Bankruptcy Code.

Because the Chapter 7 trustee ultimately seeks to avoid SWC's transfer of the contested items to Africh, the first issue is whether SWC ever had any ownership interest in them. The Williamsen Trust asserts SWC did not. If SWC had no interest to transfer, the avoidance issues are moot. As such, the Court will present this saga in two separate parts. Part I addresses who owned this memorabilia *before* it was sold to Africh. Part II resolves whether the transfer to Africh was fraudulent and is avoidable.

## PROLOGUE

### *Limiting the Cast of Characters*

As a prelude, many of the defendants who at one time may have asserted a claim to Jasgur's work failed to respond or appear at trial. Each was properly served and given an ample opportunity to participate in this litigation. The Court finds these parties have no interest of any kind in the assets at issue (the "PITA Assets," defined *infra* at page 6). Specifically, the Court holds that none of the following persons or entities has an ownership interest in the PITA Assets: Debbie Jasgur,[6]

---

**2.** Substantive opinions include: Memorandum Opinion Denying Demand for Jury Trial (Doc. No. 160 in 6:04–ap77–KSJ) The Court held that the parties are not entitled to a jury trial; the decision was affirmed at *Africh v. Musselman (In re Seminole Walls & Ceilings Corp.)*, 412 B.R. 878 (M.D.Fla.2008); Order Denying Request for Judicial Notice (Doc. No. 248 in 6:04–ap–77–KSJ); Memorandum Opinion defining PITA's rights in the Jasgur Collection and opining on Jasgur's request, at that time, to unilaterally repudiate the settlement agreement between the Chapter 7 trustee and Jasgur (Doc. No. 278 in 6:04–ap–77–KSJ); Supplemental Memorandum Opinion (Doc. No. 365 in 6:04–ap–77–KSJ); Memorandum Opinion (Doc. No. 394 in 6:04–ap–77–KSJ); Order Granting Motions for Reconsideration (Doc. No. 417 in 6:04–ap–77–KSJ); and *Musselman v. Stanonik (In re Seminole*

*Walls & Ceilings Corp.)*, 388 B.R. 386 (M.D.Fla.2008).

**3.** The trial was held from May 24–28, 2010.

**4.** The Chapter 7 trustee filed Adversary Proceeding 6:04–ap–77–KSJ to determine who has a legitimate ownership interest in the assets, and Adversary Proceeding 6:04–ap–79–KSJ to avoid the 2003 transfer of the assets to defendant Africh Maintenance, Inc. All references to docket entries are to Adversary Proceeding 4–77 unless otherwise noted.

**5.** All references to the Bankruptcy Code are to Title 11 of the United States Code.

**6.** Debbie Jasgur, n/k/a Debbie Van Neste, was Jasgur's wife during the relevant time period. Debbie disclaimed any interest in the PITA

Robert Fox,[7] Vintage Partners, Inc.,[8] Bradley E. Whittle,[9] The Funding Solutions, Inc.,[10] Joseph Yaron,[11] and Gene T. Chambers.[12]

As to the Chapter 7 trustee's claims against Joseph Jasgur—now Jasgur's estate, Jasgur having died on March 21, 2009—the Chapter 7 trustee and the representative of Jasgur's estate, Tom Endre, have reached a settlement agreement that requires the estate to turnover to the Chapter 7 trustee all items that are part of the "Jasgur Collection" currently in the estate's possession.[13] Under the terms of the settlement, the Chapter 7 trustee will market and sell the Jasgur Collection, and, after paying any portion due to any other party claiming a valid interest, the Chapter 7 trustee and Jasgur's estate will split the proceeds, with the Chapter 7 trustee receiving 50% and Jasgur's estate receiving the remaining 50%. The settlement also resolves any intellectual property issues relating to the Chapter 7 trustee's sale, which greatly enhances the value of the Jasgur Collection. The assets at issue in this litigation—the PITA Assets—are a subset of the larger Jasgur Collection.

As to the Chapter 7 trustee's claims against Paul Philipson, his interests are

Assets almost immediately after the Chapter 7 trustee filed these Adversary Proceedings (Doc. No. 14). On April 7, 2005, the Court entered a stipulated order finding Debbie has no interest in the PITA Assets and is not entitled to a share of proceeds from their sale (Doc. No. 61).

7. Fox ran the debtor, SWC. He has never asserted an individual ownership interest in the PITA Assets.

8. Vintage Partners is an Orlando company that entered into a transaction with Fox on November 4, 2000, to buy the PITA Assets. The sale was never consummated; Vintage Partners has not asserted any current interest in the PITA Assets.

9. Whittle was Vintage Partners' president and represented Vintage Partners in its purchase of the PITA Assets. He has not participated or made an appearance in this case since June 3, 2004.

10. The Funding Solutions is a Connecticut-based company that executed a contract with SWC and PITA to arrange a $500,000 loan to fund a project related to the PITA Assets. (Ex. 131.) The deal fell apart and litigation ensued. (Exs. 133, 134.) On June 15, 2005, the Court entered a default final judgment against Funding Solutions, holding it does not have an interest in the PITA Assets (Doc. No. 106).

11. Yaron owned a storage unit in California where Jasgur had abandoned many pieces of memorabilia. PITA later bought these items, which are included as part of the PITA Assets. Yaron disclaimed an interest in the PITA Assets, and on March 31, 2009, the Court entered a final judgment holding he does not have an interest in or possession of the PITA Assets (Doc. No. 368).

12. Chambers was the Chapter 7 trustee in Robert Fox's personal bankruptcy case (Doc. No. 213 in Fox's personal bankruptcy case, Case No. 6:05-bk-04437-KSJ). After Fox filed for bankruptcy in 2005, the Chapter 7 trustee in these Adversary Proceedings amended her complaint to substitute Chambers as a defendant. Chambers subsequently filed a counterclaim to the Chapter 7 trustee's Second Amended Complaint, but later voluntarily dismissed the counterclaim (Doc. No. 141). Fox received a discharge on September 8, 2005; his Chapter 7 case was closed on August 8, 2006.

13. Doc. No. 591 in the Main Case. In the agreement, Endre and the Chapter 7 trustee defined the Jasgur Collection as: all photographic works, cameras, model release forms and other memorabilia and interests relating to Marilyn Monroe, the Hollywood Canteen (the World War II-era club where celebrities mixed with U.S. servicemen and women), and other Hollywood celebrities. The Jasgur Collection does not include Jasgur's FBI crime photos or personal photos not related to Marilyn Monroe, the Hollywood Canteen, or other Hollywood celebrities (Doc. No. 593 in the Main Case).

resolved in the settlement agreement with Tom Endre which provides that Philipson's claims shall be satisfied from the Jasgur estate's 50%. Previously, the Court had ruled that Philipson may have some interest in the Jasgur Collection based on certain copyright documents filed with the United States Copyright Office (Doc. No, 278). Because Philipson's claim lies appropriately against the Jasgur estate and not the bankruptcy estate and because of the settlement reached with Endre, the Court need not further rule on Philipson's interest in the PITA Assets.

## PART ONE

## THE UNLIKELY STORY OF HOW MARILYN MONROE'S FIRST PROFESSIONAL PHOTOGRAPHS CAME INTO POSSESSION OF A FLORIDA DRYWALL COMPANY

### CHAPTER 1: A Young Photographer Fails to Capitalize on his Good Fortune

This story begins in the 1940s when Joseph Jasgur, then a young photographer, took the earliest known model photographs of Marilyn Monroe. While living in Hollywood, young Jasgur lived the life of a "glamour groupie," mingling with celebrities and Hollywood icons at movie studios, always camera in hand. He took voluminous photographs of many Hollywood stars and collected Hollywood memorabilia, hoping to make a fortune someday. Fortune indeed appeared to have smiled on young Jasgur when he photographed an aspiring starlet named Norma Jean Dougherty, who the world has since come to know as Marilyn Monroe.

Despite being in the right place at the right time in his youth, Jasgur recently passed away seeing little return on his life's work. He never received or followed competent legal or financial advice. Throughout his life he sold and resold his work to numerous parties in a series of haphazard transactions that were never well documented and for which Jasgur rarely collected any money. The last in this series of bungled transactions was to a most unlikely purchaser: PITA Corporation,[14] a holding company then controlled by this story's apparent villain, Robert Fox.

On January 6, 2000, PITA and Jasgur signed a purchase agreement providing that, for $6,250, Jasgur would sell to PITA the rights to copies of 250 black and white 11 by 14 inch photos of Marilyn Monroe (10 sets containing 25 images per set), along with 20 signed letters of authenticity.[15] Because Jasgur retained the original prints, negatives, and the copyright to all of the photos, no ownership rights transferred to PITA at this time. Then, contemplating a long term business relationship, on February 1, 2000, the parties executed an Exclusive Marketing Agreement (the "EMA"), giving PITA the exclusive right to market and sell the photos.[16] Under the EMA, Jasgur and Fox agreed that some of Jasgur's work could be displayed at a "gallery"—an Orlando restaurant owned by Fox's son Robert Fox, II, known as "Robo." Given Jasgur's tempestuous history, it was not long before Jasgur and Fox's relationship deteriorated, culminating in Jasgur and his wife, Debbie, removing from the restaurant any image covered by their agree-

**14.** The evidence indicates PITA is an aptly named acronym for "Pain in the Ass."

**15.** Exs. 268, 269, 270. PITA later paid $1,000 for the negatives of these photos.

**16.** Ex. 266.

ment. State court litigation ensued for breach of the EMA.

Shortly before Jasgur and Fox's relationship blew up, Jasgur arranged for Fox to salvage 17,000 pounds of assorted memorabilia and property Jasgur had abandoned in a storage unit in California. On March 17, 2000, Fox, acting as PITA's president, agreed to purchase for $25,000 the contents of the abandoned storage unit from its owner, Joseph Yaron.[17] (The PITA Assets consist of the photos purchased on January 6, 2000, and the assets contained in Yaron's storage unit.) PITA promptly hired a moving van and transported all 17,000 pounds of assorted memorabilia to Orlando, where Fox stored them in a warehouse used by SWC, the debtor company that installed drywall in mostly commercial locations.

## CHAPTER 2: PITA's Creation and its Creator, Will

Why did PITA, a Texas company originally formed to hold stock in a real estate venture, purchase 250 black and white photos of Marilyn Monroe and 17,000 pounds of other Hollywood memorabilia? Suffice it to say that PITA's decision maker, Fox, was a speculative investor who, by chance, struck up a relationship with Jasgur and saw an opportunity. To fully answer this question, however, some background on PITA and its creator, Gail "Will" A. Williamsen is merited.

In the early 1990s, Will was a real estate developer working on a large project in Houston called "The Commons of Lake Houston Ltd." Fox, also in the construction business, met Will, and the two men became friends and business colleagues. Will, who had seven daughters, was older and treated Fox as the son he never had. About this time, Will was actively seeking investors for The Commons project, and Fox, through his company SWC, made a substantial investment along with Fox's mother-in-law Nancy Tickle and some of Will's and his wife Diana's relatives.[18]

In 1995, Will incorporated PITA Corporation as a Texas corporation to hold these equity contributions in The Commons.[19] PITA and a company named Suntex Fuller were the two general partners of the project. Will was PITA's initial president and sole director.[20] He held the vast majority of PITA's stock—22,000 shares.[21] PITA issued 7,550 shares to its other shareholders, including 3,250 shares to SWC.[22] As such, SWC was an early if not original shareholder in PITA.

In late 1997, Will's health declined. Will and Diana left Houston and moved to Orlando for medical treatment. While Will was in the hospital, Diana moved into an Orlando home owned by Fox and his wife.

---

17. On September 3, 1998, a California state court entered a default judgment against Jasgur and granted Yaron a Writ of Possession to regain control over the storage unit and to dispose of its contents. Yaron, rather than immediately throwing out Jasgur's property, gave Jasgur a last opportunity to retrieve his possessions, which led to Fox's involvement.

18. Will and Diana's relatives who invested in The Commons were Kathy Lindgren (Will's oldest daughter), Paul and Vern Williamsen (Will's brothers), Phillip and Laura Miller (Diana's parents), and Peter Miller (Diana's brother).

19. Doc. No. 430, Stipulated Fact # 2.

20. *Id., Stipulated Fact # 3.*

21. Stock certificates evidencing Will's ownership were issued on November 10, 1998, after Will's death.

22. PITA's original share distribution was as follows: SWC–3,250 shares; Nancy Tickle–1,250 shares; and a total of 3,050 shares to Will and Diana's relatives: Kathy Lindgren, Paul and Vern Williamsen, Phillip and Laura Miller, and Peter Miller.

Will died on February 15, 1998,[23] and was survived by Diana, his wife of 15 years, and his seven adult daughters from a prior marriage.[24] After her husband's death, Diana bought a house in Fox's neighborhood and continued living in Orlando.

Shortly before his death, Will established the Williamsen Trust for the benefit of his seven daughters.[25] Diana was named the trustee for the Williamsen Trust. The only beneficiaries are Will's seven daughters.[26] In his Last Will and Testament, Will devised his 22,000 shares in PITA, leaving half to Diana and half to the Williamsen Trust.[27]

### CHAPTER 3: Fox Wrests Control of PITA from Will's Grieving Widow and Daughters and Squanders its Cash

Although Fox affectionately referred to Will, who acted as his mentor and benefactor, as "Daddy," he completely disregarded Will's dying wish to ensure Diana and his daughters got the benefit of his PITA stock. Fox lied and threatened his way into a position of complete control over PITA and promptly destroyed much of its value. Perhaps motivating Fox's behavior, on June 16, 1998, PITA and Suntex Fuller settled an ongoing dispute, with Suntex agreeing to pay PITA $2.2 million cash.

Fox acted quickly and ruthlessly to get control of this large cash settlement. Fox positioned himself as president of PITA.[28]

He moved PITA's corporate office to SWC's Orlando office.[29] He then took steps to buy back all outstanding PITA shares from Diana, her relatives, the Williamsen Trust, and his mother-in-law, ensuring that SWC was PITA's sole shareholder.

Fox, a very persuasive man, worked diligently to induce PITA's shareholders to sell their shares. In August 1998, Fox convinced Diana to individually buy the 3,050 shares of PITA held by Kathy Lindgren and Diana's other relatives, paying $40 per share, per Fox's instructions.[30] Then, on September 9, 1998, SWC bought Nancy Tickle's 1,250 shares. Nancy, who the reader will recall is Fox's mother-in-law, executed a stock power agreement, and SWC paid her $75,000 ($60 a share).[31] At trial Nancy testified she did not sell her shares to SWC, but to one of three parties: Will's daughters, PITA, or the Williamsen Trust. She testified that she was going to sell her shares to SWC, but that it "never came up with the money." Nancy's testimony was not credible and appeared staged. Ample evidence contradicts Nancy's untruthful story. Indeed, Fox told the accountant preparing SWC's 1998 tax return that SWC had bought Nancy's shares.[32]

After Nancy sold her shares, PITA had only three shareholders: SWC, Diana, and the Williamsen Trust. Diana controlled

23. Doc. No. 430, Stipulated Fact # 5.

24. *Id., Stipulated Fact # 7.*

25. Ex. 107.

26. *Id.*

27. *Id.*

28. Ex. 117, p. 1.

29. *Id.*, p. 3. SWC's office was located at 333 E. Landstreet Road in Orlando.

30. Exs. 104, 149.

31. Exs. 104, p. 15; 152, p. 3; 145; 214, p. 3; 215, p. 2; 157; Diana originally issued Certificate No. 7 to Nancy who later lost the document. Nancy executed an affidavit of lost certificate, and Diana issued her a replacement—Certificate No. 10. Ex. 152.

32. Ex. 74, p. 7.

her own shares and, in her capacity as trustee, the shares owned by the Williamsen Trust. Fox now had only to remove Diana from control to complete his takeover of PITA.

Diana initially resisted Fox's efforts. Fox wanted to use PITA to invest in more real estate ventures; Diana did not. He threatened to take over the company if she did not go along with his plans; she resisted.[33] Fox pressured Diana to sell to PITA the shares she owned individually and as trustee of the Williamsen Trust and fabricated excuses why the sale had to take place immediately.[34] He lobbied the daughters to sell the Williamsen Trust's shares to PITA and used them to pressure Diana. Fox then began directly threatening Diana. Because PITA had not yet issued stock certificates to reflect Will's undisputed ownership interest in the company, Fox told Diana that he, through SWC, controlled all issued PITA stock. He refused to issue any shares to either Diana or the Williamsen Trust, in defiance of Will's clear directions.

When Diana hired a lawyer to force the issuance of the shares, Fox and his attorney refused to provide basic financial information about PITA and, as retribution, threatened to initiate litigation against Diana individually to damage her financially and emotionally.[35] Even Diana's attorney, a well-established and experienced lawyer, found Fox and his attorney very threatening. Fox's bullying eventually escalated to

threats of physical violence, promising at one point during their dispute to make sure Diana "wasn't breathing." Diana, frightened that Fox would act on his threats, moved out of Fox's neighborhood and in with a friend for several months. Diana's testimony on this traumatic period in her life was tragically credible. She truthfully testified about her fear of Fox and his antics.

Fox's threats and pressure took their toll on Diana. Against the advice of her attorney, who advised her she likely controlled approximately 85% of PITA's shares, she eventually agreed to sell her stock back to PITA.[36] On November 21, 1998, PITA accepted Diana's "offer" to buy her 14,050 shares of stock.[37] (Diana's 14,050 shares included the 3,050 shares she bought from relatives in August and the 11,000 shares she inherited from Will.[38]) Diana transferred both sets of shares to PITA in November 1998.[39] PITA paid for the shares with a $300,000 promissory note payable on November 30, 1999,[40] which PITA timely honored on November 29, 1999.[41]

Although Diana took some "convincing," Fox did not have to work hard to persuade the Williamsen daughters to sell their shares to PITA. On the same day she sold her PITA shares, November 21, 1998, Diana, as trustee, also accepted PITA's offer to buy the 11,000 PITA shares owned by the Williamsen Trust for a $630,000 promissory note also due November 30, 1999.[42]

33. Ex. 194.

34. Ex. 174.

35. *Id.*

36. *Id.*

37. Ex. 169, p. 5.

38. Diana's inheritance of 11,000 shares of Will's PITA stock was memorialized in a stock

certificate issued on November 10, 1998. Exs. 104, p. 18; 127, p. 3; 160.

39. Ex. 128, p. 2, 4.

40. Ex. 166.

41. Ex. 183.

42. Ex. 169, p. 4.

Diana, as trustee, all seven daughters, and Fox as PITA's president executed a written agreement to this effect.[43] PITA gave no security agreement or collateral to the Williamsen Trust in exchange for the purchase of the Trust's shares or to guarantee the payment of the promissory note.

PITA never honored the $630,000 promissory note due to the Williamsen Trust, despite two extensions of the maturity date. On November 30, 1999, the note's initial due date, each of Will's seven daughters agreed to extend the payoff date to February 15, 2000, in exchange for $35,000. (Fox wrote each daughter a check for $5,000.[44]) Shortly thereafter, in December 1999, Fox convinced the daughters to appoint him as trustee for the Williamsen Trust.[45] After PITA again failed to make payment on the extended note maturity date, on June 28, 2000, while serving as both PITA's president and as the trustee acting for the Williamsen Trust, Fox again agreed to extend the note's due date, this time to November 30, 2000. Fox again wrote $5,000 checks to each daughter, some of which bounced.[46] PITA has never since paid the promissory note due to the Williamsen Trust or obtained further extensions.

Given his repeated failure to pay them for their PITA shares, the extent of the Williamsen daughters' trust in Fox is remarkable. They never sued PITA or Fox or even demanded payment, even though Fox swindled them of their inheritance. Linda Hayman, one of Will's daughters, even believes she became president of PITA on August 4, 2005, when Fox purported to step down as PITA's president.[47] As the reader will soon see, PITA dissolved on February 12, 1999, and legally ceased to exist on February 12, 2002. Yet Linda still believes she is PITA's current president. To this day the daughters continue to trust Fox, interacting with him amicably at the trial. What may be worse, though, is that all of the daughters still believe Fox was acting in their best interest when he arranged for the Williamsen Trust to sell all its shares to PITA.

After buying all of Diana's and the Williamsen Trust's shares, the debtor, SWC, became PITA's sole shareholder. Fox now had complete control of PITA and could squander or secrete its cash without interference. PITA was flush with the $2.2 million cash paid by Suntex Fuller, which Fox used as his personal "piggy bank." He began giving monies to SWC and his son Robo, day trading, and making risky, speculative investments, like buying Hollywood memorabilia. In June and July of 1998, he made two "loans" to Robo in an aggregate amount of $105,000.[48] These "loans" were never repaid. Likewise, between July 1998 and July 2000, Fox made millions of dollars worth of transfers between PITA and SWC.[49] Fox was simply shuffling money between accounts, treating both companies' funds interchangeably.

Fox also was an obsessive day trader and used PITA's monies to make trades. In August 1998, he used PITA's cash to open a brokerage account in PITA's name,[50] which he used to make risky high-

43. Ex. 167.

44. Ex. 185.

45. Exs. 188,312.

46. Exs. 191; 201, p. 1.

47. Ex. 251.

48. Exs. 329, p. 3; 337.

49. Ex. 340, p. 1–2.

50. Ex. 196.

volume day trades.[51] The first month the account was open he bought and sold tens of thousands of dollars worth of stock on a daily basis[52] and racked up almost a quarter million dollars of debt by buying stock on margin.[53] His day trading did produce some sporadic "profits," but, by December 2000, the account was valued at only $13,273.07.[54] The Court suspects that Fox either lost the balance of PITA's substantial funds through day trading or shuffled the funds through the debtor to himself. And lest we forget, in early 2000, Fox used PITA to acquire 250 black and white pictures of Marilyn Monroe and 17,000 pounds of assorted Hollywood memorabilia from Jasgur—the PITA Assets.

Further highlighting Fox's control of PITA and the extent to which he treated PITA and SWC interchangeably, Fox filed consolidated tax returns for the two companies. SWC's federal tax returns from July 1998 through June 2002 integrated PITA's finances into its own.[55] While Fox's day trading with PITA's money produced some profits, SWC was experiencing significant operational losses. Combining the two companies' finances allowed Fox to off-set PITA's profits with SWC's losses.

Not surprisingly, given Fox's complete disregard for corporate formalities and rules in general, Fox eventually failed to file necessary corporate documents for PITA with the Texas Secretary of State. PITA thus forfeited its charter and became an "inactive" Texas corporation on February 12, 1999.[56] Under Texas law, a corporation that forfeits its charter is treated as a dissolved corporation.[57] Therefore, PITA became a dissolved corporation as of February 12, 1999, and had three years to wind up its affairs,[58] after which PITA would cease to exist as a legal entity and title to any assets PITA still owned would pass unencumbered to PITA's remaining shareholders.[59] Title to the PITA Assets thus passed to whoever owned PITA stock as of February 12, 2002—in this case, the debtor, SWC.[60]

### CHAPTER 4: The Williamsen Daughters and their Trust Have Not Held Shares in PITA Since November 21, 1998

The parties to these adversary proceedings have spent years and extraordinary cost litigating who were PITA's shareholders on the day it ceased to exist as a Texas corporation. In light of the evidence presented at trial, the Court accepts the Chapter 7 trustee's contention that SWC—more precisely, the reorganized debtor—was PITA's sole shareholder as of February 12, 2002. The Williamsen Trust and

---

51. Ex. 126.

52. Exs. 204, 205, 206, 207.

53. Ex. 204.

54. Ex. 208.

55. Exs. 78, 79, 80, 81.

56. Doc. No. 278, p. 24.

57. Tex. Bus. Corp. Act Ann. Art. 7.12F(1) (Vernon 2003).

58. Doc. No. 278, p. 24–25.

59. PITA's assets passed unencumbered because there was a three-year statute of limitations to bring a cause of action that arose *before* PITA dissolved on February 12, 1999. *Durham Clinic, PA. v. Barrett, 107 S.W.3d 761, 762–63 (Tex.App.-Waco 2003).* No party timely filed suit against PITA seeking to encumber its assets, so all claims were extinguished after the statute of limitations ran.

60. This Court previously has resolved the issue of whether PITA, as a dissolved corporation, could purchase the PITA Assets and held that PITA's only claim to the PITA Assets rested on its physical possession (Doc. No. 278).

Africh Defendants [61] have asserted, to the contrary, that the Williamsen Trust was the sole shareholder, arguing: (1) the Chapter 7 trustee cannot prove SWC was a shareholder because she has not produced stock certificates showing its ownership interest in PITA; (2) even if SWC did at some point own PITA stock, PITA bought back SWC's shares on July 22, 1998, for $100,000; and (3) the Williamsen Trust never sold its shares to PITA. The Court will address each of these arguments in turn.

### SWC was PITA's Sole Shareholder, Even Though the Chapter 7 Trustee Could Not Locate a Written Stock Certificate

 First, the defendants argue that the Chapter 7 trustee failed to prove SWC was PITA's sole shareholder because she could not produce a written stock certificate. As an initial matter, Texas law of corporations and securities applies to this dispute because a corporation's rights are governed by the law of its state of incorporation.[62] Texas has adopted Article 8 of the Uniform Commercial Code, which governs the creation and transfer of corporate securities. Article 8 does not require a stock certificate to prove ownership in a company. A stock certificate is not by itself stock in a corporation; it is merely evidence of ownership.[63] In fact, stock ownership "may, and often does, exist without" evidence of a certificate.[64] Rath-

er, in order to create a stockholder relationship, a party must show an agreement giving the shareholder the ability to exercise a shareholder's rights.[65] Courts often imply such agreements or contracts from the parties' acts and the surrounding circumstances.[66]

 Even if PITA never issued a stock certificate to SWC (which it likely did but Fox has either hidden or destroyed), abundant evidence demonstrates SWC's shareholder relationship with PITA. According to a PITA shareholder meeting minute entry dated November 21, 1998, signed by Diana, SWC was one of PITA's original shareholders, and its shares were issued along with all the other original owners' shares on July 22, 1996.[67] Diana testified she personally issued a stock certificate to SWC in December 1996, the same time she issued stock certificates to PITA's other original shareholders. Moreover, SWC voted its shares at shareholder meetings held in April and November 1998.[68] Thus, disregarding the absence of the earlier stock certificate, the evidence shows SWC was an original shareholder of PITA, holding 3,250 shares issued in 1996, and that it later bought an additional 1,250 shares from Nancy Tickle in 1998. Given all of this evidence demonstrating a stockholder relationship between SWC and PITA, the Chapter 7 trustee's failure to produce a stock certificate is inconsequential.

61. The Africh Defendants consist of Dartlin Africh individually, Africh Maintenance, Inc., and Africh Management & Investment, Inc.

62. *In re Bercu*, 293 B.R. 806, 809–10 (Bankr. M.D.Fla.2003), *citing ABZ Ins. Services, Inc.*, 245 B.R. 255 (Bankr.N.D.Tex.2000).

63. *Turner v. Cattleman's Trust Co.*, 215 S.W. 831, 833 (Tex.Com.App.1919); *The Estate of Bridges v. Mosebrook*, 662 S.W.2d 116, 120 (Tex.App.Fort Worth 1983).

64. *Furr v. Chapman*, 286 S.W. 171, 172 (Tex. Com.App.1926).

65. *Coates v. Parnassus Systems, Inc.*, No. 03–01–00549–CV, 2002 WL 534595, at *2–3 (Tex. App.-Austin Apr.11, 2002).

66. *Hallmark v. Hand*, 833 S.W.2d 603, 607 (Tex.App.-Corpus Christi 1992).

67. Ex. 169.

68. Exs. 118, 169.

### SWC Did Not Sell Its Shares Back to PITA or to Anyone Else

■ Second, the defendants argue SWC magically sold its shares back to PITA, relying upon a single check, dated July 22, 1998, for $100,000 from PITA payable to SWC whose memo line reads "repurchase of Pita stock." [69] In light of all the other circumstantial evidence on record, this check's memo line alone is not enough evidence to establish SWC's intent to sell its 3,250 shares. [70] Indeed, PITA's shareholder meeting minutes from November 21, 1998—four months after the alleged July 1998 sale—list SWC as a shareholder. [71] Nothing credibly demonstrates that SWC sold any shares back to PITA after its initial purchase.

### The Williamsen Trust Irrevocably Sold Its PITA Shares on November 21, 1998

■ Third, the defendants argue that the Williamsen Trust never actually sold its shares to PITA because the Chapter 7 trustee cannot locate an endorsed stock certificate reflecting the transfer. The Court rejects this argument. The evidence overwhelmingly shows the Williamsen Trust beneficiaries and Diana, acting as trustee, intended to irrevocably sell the Trust's shares to PITA on November 21, 1998.

■ Even if PITA never issued an endorsed stock certificate, Texas common law excuses compliance with formal transfer requirements when the intent of the parties is clear. Although UCC Article 8, applicable in Texas, requires a party selling a corporate security to observe certain formalities, including delivering a stock certificate to the buyer or delivering an endorsed stock certificate to an intermediary, [72] Texas common law allows courts to consider the intent of the parties in the event of a dispute, such as this, to determine what, if any, securities were transferred. [73] Complete ownership of a stock may exist without the issuance of a certificate or its delivery, [74] and a shareholder can transfer shares without signing, endorsing, or delivering stock certificates, and without memorializing the transfer in the corporation's records. [75] Instead, parties can transfer stock without the formalities of endorsement and delivery if they clearly intend that the transfer take place. [76]

The Court has no doubt the Williamsen Trust and Will's seven daughters intended to sell, and PITA intended to buy, the Trust's 11,000 shares of PITA stock on November 21, 1998. Not only do PITA's meeting minutes reflect this intention when the Board of Directors and shareholders resolved to buy the shares, [77] but PITA and the Williamsen Trust actually

---

**69.** Ex. 329, p. 1.

**70.** The Court also questions whether Fox would allow his company, SWC, to receive only $32.50/share when others were receiving between $40–$60/share for the purchase of PITA stock during the same period. Fox simply would not have paid himself a lower amount than third parties received.

**71.** Ex. 169.

**72.** *See* Tex. Bus. & Comm.Code Chp. 8 §§ 8.104, 8.301(a)(1)-(3).

**73.** *Greenspun v. Greenspun,* 194 S.W.2d 134, 137 (Tex.App.-Fort Worth 1946).

**74.** *Matter of Estate of Crawford,* 795 S.W.2d 835, 838 (Tex.App.-Amarillo 1990).

**75.** *Gilvarry v. Catalina,* No. 01–92–0093–CV, 1994 WL 400415, at *12 (Tex.App.-Houston (1st Dist.) Aug. 4, 1994).

**76.** *Greenspun,* 194 S.W.2d at 137.

**77.** Ex. 169, p. 4.

executed a written agreement to transfer the shares.[78] No guessing or inference is required. The agreement clearly states the Williamsen Trust agreed to sell its shares for $630,000, in exchange for a promissory note that was payable on or before November 30, 1999.[79] Moreover, Diana testified that she, as trustee for the Williamsen Trust, sold the shares to PITA on November 21, 1998, and the Williamsen daughters twice extended payment on the promissory note PITA issued as payment for the Trust's shares.

Given the abundant evidence of the Williamsen Trust's intent to sell its stock to PITA, and Fox's pattern of hiding and destroying important corporate records, the Chapter 7 trustee's failure to produce an endorsed stock certificate for the Williamsen Trust's shares is understandable and of no moment.[80] Instead of showing that the Williamsen Trust never transferred its shares to PITA, the absence of an endorsed stock certificate more likely is one more example of Fox's misdeeds.

While searching SWC's office, the Chapter 7 trustee could not locate PITA's stock book or other PITA documents, even though Fox typically kept these records in SWC's office.[81] The Court thus finds it much more likely that Fox simply destroyed or hid documentary evidence regarding the Williamsen Trust's stock transfer to PITA, just as he did with most of PITA's other corporate records.

■ The Africh Defendants further argue the Williamsen Trust only sold its shares contingent upon being paid $630,000.[82] The evidence, including most notably the text of the parties' written agreement, suggests otherwise. The agreement clearly states that the Williamsen Trust beneficiaries agree to sell 11,000 shares for $630,000, to be paid on or before November 30, 1999.[83] Nothing in the agreement makes the transfer or sale of the shares contingent upon PITA timely honoring the promissory note. The promissory note itself was consideration for the shares. Without specific language grant-

**78.** Ex. 167.

**79.** The operative part of the agreement reads as follows: "The Beneficiaries agree and consent to the Trustee to sell PITA CORPORATION said Eleven Thousand (11,000) shares of Stock; and to PITA CORPORATION'S purchase of said Stock from the Trust for the sum of Six Hundred Thirty Thousand ($630,000) Dollars. Said sum to be paid on or before November 30, 1999. Said sum represents full, fair and adequate consideration for the purchase of the Stock." Ex. 167, p. 5.

**80.** The Chapter 7 trustee did produce a copy of the front of a Williamsen Trust stock certificate but not the back of the certificate, where it would have been endorsed.

**81.** Ex. 234, p. 6.

**82.** The Court notes the Africh Defendants promoted this argument out of self-interest, not of a desire to help the daughters recover the money owed to them. Africh is paying the Williamsen Trust's legal bills, but is promot-

ing legal theories that would not benefit the Trust. If the Williamsen Trust (and not SWC) were the sole shareholder and gained title to the PITA Assets on February 12, 2002, SWC would not have owned the PITA Assets, and the Chapter 7 trustee would not have standing to undo their sale to Africh Maintenance. In that scenario, Africh would retain ownership of the PITA Assets. Africh is under no obligation to share with the Williamsen Trust any financial reward that might come from owning the PITA Assets. He specifically is under no obligation to pay on the promissory note due to the Williamsen Trust. He told Will's daughter Linda Hayman he would personally guarantee the promissory note, yet he has not memorialized this promise in writing or otherwise made it legally enforceable. After the daughters unwisely put their faith in Fox to look after their best interest, they appear now to put their faith and financial future in the hands of yet another person looking out primarily for his own bottom line—Dartlin Africh.

**83.** Ex. 167, p. 5.

ing the transferor a lien on the assets transferred or otherwise specifically making completion of the sale contingent upon receipt of cash in hand, the Court cannot find that the parties intended such a contingency. Rather, the Court specifically finds that Will's daughters trusted Fox and sold him their PITA shares believing he would pay the promissory note. They did not ask for any type of security interest or reserve any type of contingency to the transfer.

The Chapter 7 trustee has proven that SWC was the sole shareholder of PITA after November 21, 1998, even though she has no supporting stock certificate. Moreover, the Chapter 7 trustee has proven that the Williamsen Trust clearly intended to sell its shares of PITA back to PITA, again, even though she has no endorsed stock certificate reflecting the transfer. As of November 21, 1998, SWC held 4,500 shares: 3,250 originally issued shares and 1,250 shares bought from Nancy Tickle;[84] no other person or entity had any ownership interest in PITA. Under Texas law, because SWC was PITA's sole shareholder as of the date PITA ceased to exist as a Texas corporation, February 12, 2002, SWC assumed title to all of PITA's remaining assets, including *the* PITA Assets on that day.

### CHAPTERS: A Brief Aside to Explain Why PITA and the Africh Defendants Partially Prevail on Their Motions for Summary Judgment

■ The Africh Defendants and PITA filed motions for summary judgment[85] asserting the Chapter 7 trustee's causes of action are time-barred against both parties because she no longer can sue PITA in her capacity as a PITA shareholder. The mo-

tions also seek dismissal of the veil piercing and substantive consolidation counts (Counts I and II) on the basis that a dissolved corporation cannot be the subject of either veil piercing or substantive consolidation actions. Though these questions largely are moot because the Court holds SWC directly acquired the PITA Assets on February 12, 2002, the Court will partially grant PITA's and the Africh Defendants' motions because the Chapter 7 trustee's actions against PITA are time-barred. Counts I and II are dismissed. But because the Chapter 7 trustee is suing in her capacity as *owner* of the PITA Assets, not simply as a former PITA shareholder, the motions for summary judgment are denied to the extent they seek final judgment in favor of the Africh Defendants.

■ Although the Africh Defendants and PITA are correct that the Chapter 7 trustee cannot sue PITA in her capacity as a PITA shareholder, the trustee still has standing to recover the PITA Assets from the Africh Defendants in her capacity as the representative of SWC, the rightful owner of the PITA Assets. As the Court held above, SWC, now a liquidating debtor in Chapter 7, obtained ownership of the PITA Assets when the PITA corporate entity legally ceased to exist on February 12, 2002. Therefore, when Fox, through "PITA," attempted to sell the PITA Assets to Africh on March 31, 2003, he sold property that already had legally transferred to SWC. So, although the defendants are correct that no PITA shareholder can sue on behalf of the corporation for a cause of action that arose post-dissolution,[86] the Chapter 7 trustee still may pursue the Africh Defendants for return of the PITA Assets because she is not suing in her

---

**84.** For a full chart showing when and how PITA's ownership changed, see Appendix A.

**85.** Doc. Nos. 419 and 420 in 04–ap–77; Doc. Nos. 269 and 270 in 04–ap–79.

**86.** *See, e.g., Landrum v. Thunderbird Speedway, Inc.,* 97 S.W.3d 756, 759 (Tex.App.-Dallas 2003).

capacity as a PITA shareholder, but rather as the rightful owner of the PITA Assets.

▇▇▇▇ PITA and the Africh Defendants further are correct that PITA is not a proper defendant to these proceedings because, under Article 7.12 of the Texas Business Corporations Act, a dissolved corporation cannot be sued on a claim that arose post-dissolution.[87] PITA dissolved on February 12, 1999, and the Chapter 7 trustee's claim is based on the March 31, 2003 sale of the PITA Assets. The trustee's actions against PITA are time-barred. PITA does not exist and cannot be sued. The Africh Defendants' and PITA's motions for summary judgment are granted to the extent that the Court holds the Chapter 7 trustee cannot pierce PITA's corporate veil or substantively consolidate SWC with PITA after it dissolved and ceased to exist, nor need she since SWC became the lawful, sole owner of the PITA Assets before the transfer to Africh Maintenance. Accordingly, Counts I and II of both the Second Amended Complaints are dismissed.[88] The motions for summary judgment are partially granted to the extent that they prevent the Chapter 7 trustee from pursuing any claim for relief under alter ego or substantive consolidation grounds. The motions otherwise are denied.

### PART TWO

### FOX FRAUDULENTLY TRANSFERS THE PITA ASSETS TO AFRICH ON THE EVE OF SWC'S FORCED CONVERSION FROM CHAPTER 11 TO CHAPTER 7

Having determined both that SWC gained title to the PITA Assets as of February 12, 2002, the date that PITA officially ceased to exist as a Texas corporation, and that the Williamsen Trust has no interest in PITA, the next issue is whether SWC, a debtor in Chapter 11 bankruptcy proceedings as of March 13, 2001, fraudulently transferred the PITA Assets to Africh Maintenance on the eve of SWC's forced conversion to Chapter 7? To answer this, we return back in time to PITA's acquisition of the Jasgur photographs and introduce Dartlin Africh and his companies.

### CHAPTER 1: Who is Dartlin Africh?

Dartlin Africh was a social friend and business colleague of Fox. Africh operated and controlled a number of construction related companies out of his Orlando home, including Africh Maintenance, Inc., Africh Management & Investment ("AM & I"), and Cox Concrete.[89]

Like Fox, Africh often ignored corporate formalities in running his companies. In March 2000, Africh, individually, and AM & I made two loans to SWC/PITA in the aggregate amount of $120,000. Although the record is ambiguous on the purpose of these loans, the timing suggests the monies allowed Fox and PITA to purchase and transport the contents of Jasgur's California storage unit back to SWC's office in Orlando. Africh first wrote a check for $70,000 from his personal checking account made payable to PITA and dated March 3, 2000.[90] Soon thereafter, on March 17, 2000, PITA purchased the 17,000 pounds of Jasgur memorabilia from Yaron in California. Five days later, Africh then wrote

---

**87.** *Id.* at 758–59.

**88.** Doc. No. 55 in 04–ap–79; Doc. No. 79 in 04–ap–77.

**89.** For the sake of clarity, Cox Concrete is not one of the Africh Defendants; the Africh Defendants are Africh Maintenance, AM & I, and Africh individually.

**90.** Exs. 34, 200.

a second check for $50,000 from AM & I's account made payable to SWC.[91] SWC, not PITA, executed promissory notes in favor of Africh in his individual capacity for *both* loans, even though the $70,000 loan check was payable to PITA, the purchaser of the Jasgur items. Both notes required SWC to repay Africh quickly—on March 15, 2000, and May 21, 2000, respectively.[92]

Consistent with Fox's *modus operandi*, SWC never repaid Africh or AM & I. SWC did issue checks to Africh, but they were denied for insufficient funds. After the checks bounced, perhaps to appease Africh, on December 14, 2000, Fox arranged for SWC (not PITA) to execute a security agreement granting Africh and AM & I a security interest in a $1.8 million note issued by Vintage Partners, Inc., and PITA's UCC-1 filing securing that note.[93] You see, Fox had not sat idle with the PITA Assets. On November 4, 2000, he struck a deal with Vintage Partners to sell the PITA Assets to Vintage Partners in exchange for a $1.8 million promissory note *and* payment of a $200,000 debt Fox personally owed to yet another sucker— Value Pawn and Jewelry Store, Inc.[94] PITA retained a security interest in the PITA Assets to secure the repayment of the Vintage Partners note. Fox never transferred the entirety of the PITA Assets to Vintage, but the record reflects he did give them a few items. Not transferring all of the Assets proved wise because Vintage Partners never made good on the note, and everyone that had *anything* to do with the Jasgur Collection or PITA Assets in the year 2000 ended up in state court litigation. Jasgur sued Fox and PITA for breach of their licensing agreement; Africh sued SWC for repayment of principal on his two loans, seeking treble damages for the bounced checks; and Vintage Partners eventually interplead in the Jasgur–Fox lawsuit.[95] The details of this litigation are not important now other than to note that, with the exception of perhaps a few hundred dollars of interest,[96] SWC never paid Africh or AM & I on their $120,000 loans.

(Much later, however, while SWC was in bankruptcy, another of Fox's company's, FOSCO, attempted to placate Africh with $20,000.[97] Africh and Fox apparently struck this side deal on June 27, 2002, while SWC was in the midst of seeking confirmation of its Third Amended Plan of Reorganization. FOSCO was technically not a party to SWC's bankruptcy, but Fox,

---

91. Ex. 38.

92. Exs. 35, 37.

93. Exs. 48, 49.

94. Around this time, Fox also struck a deal with The Funding Solutions, Inc., a Connecticut company, to arrange a $500,000 loan to help finance a project related to the PITA Assets. Ex. 131. Fox gave some items from the PITA Assets to Funding Solutions. Exs. 133, 134. The deal soon fell apart, and litigation followed.

95. For a more complete recounting of the complicated facts involving the Florida state court litigation, the reader is directed to this Court's 2007 Memorandum Opinion at 366 B.R. 206 (Bankr.M.D.Fla.2007).

96. Neither of the notes called for interest payments, but Africh demanded and apparently either SWC or PITA paid some undetermined, minor amount of interest.

97. Ex. 221. Fox's testimony that he did not have direct involvement with FOSCO is not credible. Robert Scono, SWC's accountant, was officially FOSCO's president but, like all other SWC employees, he took direction solely from Fox. Fox was officially FOSCO's general manager, but, as discussed below, Fox routinely purported to put someone else in charge of his companies while still maintaining actual control over them. Fox owned and ran FOSCO Just as he did SWC and PITA

in his usual way, failed to observe corporate formalities and routinely moved money between SWC and FOSCO. Fox did not seek Court approval to pay $20,000 to one of SWC's creditors while its case was pending.)

### CHAPTER 2: SWC Files for Bankruptcy Protection, Listing a $1.8 Million Note Payable to PITA as an Asset, While Africh, Still Trying to Get Repaid, Files Proofs of Claim Listing the PITA Assets as Collateral

Fox continued to run SWC with complete disregard for corporate formalities, family ties, or friendships. Although nominally only SWC's general manager, he was, in practice, the company's only decision maker.[98] Everyone associated with SWC took directions from Fox, whether it was the president of the company or lower level employees. Fox intentionally placed family members and others he could easily manipulate in leadership positions so that he could avoid personal accountability for the company's actions while still running the show.

In late 2000, perhaps in anticipation of a bankruptcy filing, Fox reorganized SWC's officers, removing his son Robo from his position as president of SWC with the hope of relieving Robo from any personal liability for SWC's debts.[99] Fox shifted those liabilities to his sister-in-law Patti Culverhouse, Don Bright, and their spouses.[100] Culverhouse was named SWC's president, and Bright the vice president. Fox then coerced Culverhouse and Bright to personally guarantee obligations of both SWC and PITA.[101] On March 13, 2001, with SWC's liabilities shifted away from Robo, SWC filed a petition seeking reorganization under Chapter 11 of the Bankruptcy Code.[102]

Fox's manipulative behavior and complete disregard for the rules continued throughout SWC's bankruptcy proceedings. Even with the apparent regime change, Fox continued in his role as SWC's only real decision maker. He verbally abused and threatened Culverhouse into submission, repeatedly making her sign affidavits, schedules, and other pleadings designed to deceive this Court. For example, Culverhouse ostensibly sought Court approval to receive weekly wages of $2,500 as SWC's president, which the Court approved.[103] Yet, unbeknownst to the Court, Fox took $1,700 of this amount every week, leaving Culverhouse only her regular $800 weekly salary. Fox also ordered Culverhouse to distribute monies from SWC's bank account without listing the withdrawals on the debtor's financial reports.[104] Likewise, on May 25, 2001, Fox arranged for a $50,000 loan to SWC from Fox's step-father, depositing the funds in SWC's checking account without Court authorization and mislabeling the

---

98. Doc. No. 278, p. 3, n. 4.

99. Robo specifically was relieved of any personal liability on the $630,000 promissory note due to the Williamsen Trust and the $120,000 owed to Africh/AM & I. Ex. 135, p. 2.

100. Ex. 136.

101. Exs. 8, 45, 69, 136.

102. Ex. 1.

103. Doc. No. 46 in the Main Case.

104. For example, on April 5, 2001, less than one month after SWC filed its petition, Fox ordered Culverhouse to write a $31,714.79 check on SWC's checking account made payable to "cash." Exs. 6, 7. This expenditure was not listed in SWC's 4/1/2001–4/30/2001 monthly operating report. Ex. 29, Attachment 5. The Chapter 7 trustee also presented evidence Fox mislabeled various transactions as involving "Affordable Development Group" to hide other transfers of money.

inflow of cash as an account receivable from AM & I.[105]

SWC, under Fox's control, continued its efforts to reorganize and to confirm a plan of reorganization, largely relying on the value of the PITA Assets. Because the then pending litigation involving PITA, Jasgur, and Vintage Partners clouded the value of the PITA Assets, SWC proposed a plan of reorganization that contemplated that SWC either would receive payment on the $1.8 million Vintage Partners note *or* would sell the PITA Assets. Indeed, SWC submitted *four* plans of reorganization that each provided for payment of certain classes from either the Vintage Partners note payoff or the proceeds of a liquidation sale of the PITA Assets. On August 21, 2002, despite SWC's interest in the PITA Assets remaining unsettled, this Court confirmed SWC's Third Amended Plan of Reorganization.[106]

Post-confirmation, Fox continued to run SWC's operations. But, because the likelihood of a substantial recovery on the Vintage Partners note or the sale of the PITA Assets was speculative as long as the state court litigation lasted, because the debtor's earnings from its drywall business were barely enough to pay operating expenses, and because Fox's trustworthiness was questionable, the Court took the unusual step of retaining supervision over the debtor. No final decree closing the case could issue until the debtor demonstrated to the satisfaction of the Court that it had substantially consummated its confirmed plan

and, in no event, before January 29, 2003. Therefore, SWC had approximately 6 months to show it could actually perform under the confirmed plan of reorganization.

The Court's suspicions were well founded. On January 15, 2003, PITA and Vintage Partners terminated their agreement. "PITA," by this time a dissolved corporation, purportedly regained title to the PITA Assets, vis-a-vis Vintage Partners, which should have been good news for SWC's creditors. Fox, however, could not quickly liquidate the PITA Assets and apparently had no other family members to coerce. SWC's other sources of income dried up almost completely. The debtor stopped making plan payments, and creditors began seeking relief from the automatic stay and to dismiss the Chapter 11 case.[107] On February 14, 2003, the U.S. Trustee filed a Motion to Convert the Case to Chapter 7.[108] A hearing on the U.S. Trustee's motion was set for April 2, 2003.

Fox knew that he had little chance of preventing conversion to Chapter 7[109] and that he would lose control of the company. Knowing he was about to lose his SWC "piggy-bank," Fox wanted to squeeze any last value out of SWC before a Chapter 7 trustee took over. Fox accelerated his efforts to find someone to buy the PITA Assets.

In January 2003, he struck up a relationship with Las Vegas-based American Memorabilia, Inc., which offered to pay

---

**105.** Exs. 8; 9; 30, Attachment 4.

**106.** Doc. No. 249 in the Main Case.

**107.** Doc. Nos. 285 A, 302, 304 in the Main Case.

**108.** Doc. No. 299 in the Main Case.

**109.** SWC filed its last monthly operating report on March 31, 2003, which showed

SWC's poor financial situation. SWC was delinquent on payments to all of its five secured creditors, and was more than 90 days behind on payment to dozens of other creditors, including the IRS. Ex. 33, Attachment 2. SWC also was running negative balances in some of its checking accounts. Ex. 33, Attachment 5.

$2.5 million [110] or to act as liquidating agent at auction for all the PITA Assets.[111] American Memorabilia told Fox it believed the PITA Assets could potentially bring in $20–30 million at auctions over the course of several years, and so seemed to show great interest in the Assets.[112] Fox apparently transferred some items to American Memorabilia, but for unknown reasons the deal fell through.[113]

Fox then turned to his friend Africh, an unpaid unsecured creditor of SWC, to buy the PITA Assets. On July 9, 2001, still unpaid for the $120,000 loans, Africh had filed three proofs of claim in SWC's Chapter 11 case: one in his individual capacity,[114] one on behalf of AM & I,[115] and one unrelated claim for Cox Concrete.[116] The basis of his individual claim was the $70,000 loan to PITA. Likewise, AM & I's claim was for its $50,000 loan to SWC. On both of these proofs of claims Africh added claims for treble damages for SWC's bounced checks, bringing the aggregate amount of these two claims to $486,000. (Africh later increased this cumulative amount to $713,800, based on Amended Claims 73 and 74.[117])

Under the confirmed Third Amended Plan of Reorganization, Africh's Claim Nos. 73 and 74 were treated as Class 10 impaired general unsecured claims.[118] Cox Concrete's proof of claim was for an $8,000 secured claim, which the plan treated as a Class 7 secured claim. Importantly, unlike Africh's Class 10 claims, the plan provided Class 7 (along with Classes 4 and 6) would be paid specifically from the proceeds of the PITA Assets liquidation or from the payout on the $1.8 million Vintage Partners note.[119]

On March 31, 2003, knowing his chances of ever being repaid under the confirmed plan were slim, Africh bought the PITA Assets.[120] Just two days before the scheduled conversion hearing, Africh Maintenance (not the creditors AM & I or Africh individually) and PITA executed an Asset Purchase Agreement selling Africh Maintenance the PITA Assets in exchange for $200,000 cash and Africh's agreement to withdraw his two likely worthless general unsecured claims. Fox signed the Purchase Agreement in his capacity as president of PITA.

The agreement included a substantial finder's fee for Fox's company FOSCO,

110. Ex. 142.

111. Ex. 143.

112. *Id.*

113. The Chapter 7 trustee has recovered all items transferred to American Memorabilia.

114. Claim No. 57.

115. Claim No. 58.

116. Claim No. 59.

117. Exs. 48, 49; Claim Nos. 57, 58. On May 15, 2002, Africh filed two amendments to Claim No. 57—Claim Nos. 73 and 74—both apparently raising the amount claimed to $301,170 and $412,630, respectively. The Court assumes one of these amendments was

entered in error and that perhaps Africh meant to amend Claim No. 58. Africh later withdrew both Claim Nos. 73 and 74 on June 16, 2005 (Doc. Nos. 497, 498 in the Main Case).

118. These claims were included in Class 10 of the Third Amended Plan of Reorganization. Exs. 13, 14.

119. Exs. 13, 14.

120. Africh Maintenance bought *"all* the photographic works by Joseph Jasgur *owned by the Seller."* Ex. 57 ¶ 1.a (*emphasis added*). When Africh Maintenance bought the PITA Assets, it also bought any rights SWC, now the rightful owner, had to recover items still in these other parties' possession.

should FOSCO arrange another sale of the PITA Assets.[121] Specifically, Africh Maintenance and FOSCO signed a Brokerage Agreement, dated March 31, 2003, the same day Africh Maintenance bought the PITA Assets, which granted FOSCO a non-exclusive right to market, promote, and sell the PITA Assets. If FOSCO were to find an acceptable buyer, Africh Maintenance would receive the first $400,000, and FOSCO would receive a commission totaling 80% of all proceeds exceeding $400,000. It appears Dartlin Africh was hoping to double his $200,000 and split the remainder of the proceeds exceeding $400,000 with Fox on a 20/80 basis.

Africh took possession of the PITA Assets soon after the deal was made. In addition to keeping photos inside his residence, Africh stored the majority of the bulkier items in a large outdoor storage container on his property. Unfortunately, the storage container sustained water damage during a hurricane and approximately 30% of the items stored inside were destroyed. Africh moved the remaining items from the storage container to a warehouse. Many of the items he stored inside his Orlando home are now located in his current residence in Georgia. No party has completed a formal inventory of the current location of the PITA Assets.

Meanwhile, Fox continued his courtroom shenanigans. Two days after Fox and Africh executed their agreement, he appeared at the conversion hearing in dramatic fashion, waving checks around for creditors and claiming that, due to a recent $200,000 "cash infusion," he could make the needed plan payments. Other than Fox and Africh, no one in the courtroom

knew the origin of this money, much less even considered that Fox had sold SWC's most valuable asset two days earlier. In any event, $200,000 was not enough money to stop the conversion, and the Court granted the U.S. Trustee's motion to convert to Chapter 7.[122]

If there was ever any doubt Fox's courtroom antics were all for show, we now know this with certainty. On April 1, 2003, the day *before* the conversion hearing, Fox transferred $100,000 first to SWC's checking account and then to the IRS for payment of SWC's tax liabilities, for which the Court presumes Fox thought he was or may be personally liable.[123] That same day, Fox transferred the remaining $100,000 to FOSCO. The next day, *the day of the conversion hearing,* Fox transferred nearly all of the money in this account ($110,000) to another, unknown bank account.[124] Fox then closed the FOSCO account on April 8, 2003. No one, including the Chapter 7 trustee, has ever discovered the whereabouts of that $110,000.

Thus, the checks Fox waved in the courtroom at the conversion hearing were in fact mere props. SWC lacked funds to actually pay its creditors because Fox already had transferred all of SWC's funds, including the $200,000 paid by Africh, either to the IRS or to related companies controlled by Fox, prior to or on the day of the hearing. In all likelihood, Fox personally benefitted from these monies while SWC's legitimate creditors got nothing. The question now is whether Fox/SWC acted with actual intent to hinder, delay, or defraud SWC's creditors when they sold the PITA Assets to Africh Maintenance.

---

**121.** Ex. 58.

**122.** Doc. No. 312 in the Main Case.

**123.** Ex. 232.

**124.** Ex. 230.

## CHAPTER 3: Fox Transferred the PITA Assets With the Actual Intent to Defraud SWC's Creditors

■ In Count VII of the Second Amended Complaint,[125] the Chapter 7 trustee asserts that Fox/SWC transferred the PITA Assets to Africh Maintenance with the actual intent to defraud SWC's creditors. Under Florida Statute § 726.105(1), the Chapter 7 trustee has the burden of proof to establish the transfer of the PITA Assets to Africh Maintenance was done with actual fraudulent intent to hinder, delay, or defraud creditors. Because there is rarely direct proof of actual intent to defraud, courts often infer intent from circumstantial evidence and the conditions surrounding the transaction, i.e. the badges of fraud.[126] Section 726.105(1)(a) sets forth a non-exhaustive list of factors courts may consider:

(a) The transfer was to an insider.

(b) The debtor retained possession or control of the transferred property after the transfer.

(c) The transfer was concealed.

(d) Before the transfer was made the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all of the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the asset to an insider of the debtor.

The presence of just one factor may only amount to suspicious circumstances, but a combination of factors justifies a finding of actual fraud.[127]

■ At least five factors indicating actual fraud are present in this case. First, Fox retained control over the property. He sold the PITA Assets to his friend Africh and schemed to create an agreement with him that would allow Fox and his company FOSCO to profit handsomely from a future resale of the PITA Assets. Specifically, Fox included a substantial finder's fee in the purchase agreement for FOSCO to receive 80% of any resale price over $400,000 should FOSCO find another buyer. Fox thus maintained a great degree of control over the assets and put himself in a position to further benefit from their resale.

Second, Fox completely hid the transaction from the Court, creditors, and the Chapter 7 trustee. When he walked into the courtroom on April 2, 2003, Fox did not disclose he had "sold" the PITA Assets two days earlier. He never identified the source of the monies he claimed SWC obtained.

125. Count VII of the Second Amended Complaint in 6:04–ap–79 uses "§ 726.105(1)(b)," the section for a *constructive* fraudulent transfer, but the text of the Count makes clear the Chapter 7 trustee's intent was to claim an *actual* fraudulent transfer under Fla. Stat. § 726.105(1)(a).

126. *Mejia v. Ruiz*, 985 So.2d 1109, 1113 (Fla. 3d DCA 2008); *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir.1998).

127. *Mejia*, 985 So.2d at 1113.

Third, the transfer happened on the eve of conversion of SWC's Chapter 11 case to Chapter 7, which is akin to making the transfer after being threatened with a lawsuit. By selling these assets out of the Court's sight, Fox ensured he benefitted from the sale instead of SWC's many creditors. Fox never intended for the proceeds to pay the legitimate creditors who were patiently waiting for payment under SWC's confirmed plan of reorganization. Rather, Fox used $100,000 to pay the IRS, for debts he believed he may have personal liability, and simply stole the balance of the monies for his personal use. He turned over no portion of the funds to the Chapter 7 trustee.

Fourth, the PITA Assets were SWC's largest asset. The confirmed plan of reorganization indeed contemplated that it was this very asset that, after the liquidation concluded and the sale occurred, would pay creditor claims. Fox jumped the gun and sold the PITA Assets early, wanting to keep the proceeds for himself.

Fifth, SWC was insolvent at the time of the transfer, as evidenced by the conversion to Chapter 7 two days later. SWC had not made payments to creditors as required under its plan for several months. The drywall business was virtually nonexistent, as reflected by SWC's monthly operating reports. Fox was closing SWC, likely to start other ventures, and was trying to eke out the last little bit of money he could before accepting the upcoming, inevitable conversion to Chapter 7.

Given the presence of at least five badges of fraud and Fox's consistently fraudulent, self-serving behavior involving SWC, the Court concludes Fox sold the PITA Assets to Africh Maintenance with the actual intent to defraud SWC's creditors and to personally benefit at their expense.[128]

### CHAPTER 4: Africh Did Not Receive the PITA Assets in Good Faith [129]

Under Florida Statute § 726.109(1), a transferee of a purported fraudulent transfer may defend the action and prevent the Court from avoiding the transfer if he can show that he took the property "in good faith and for a reasonably equivalent value."[130] The transferee has the burden of establishing the good faith defense.[131] Because the Florida statute does not define "good faith," courts use an objective test to determine whether the transferee had actual or constructive knowledge of the debtor's fraudulent purpose.[132] To determine if the transferee had constructive knowledge, a court must decide if the transferee "had knowledge of such facts or circumstances as would have induced an ordinarily prudent person to

**128.** Because the Court finds actual fraudulent intent under § 726.105(1)(a), the Court need not address the Chapter 7 trustee's argument for finding a constructively fraudulent transfer under § 726.105(1)(b) (Count VIII of the Second Amended Complaint, Doc. No. 79 in 6:04–ap–79).

**129.** The Court notes the Africh Defendants pursued the good faith defense in a lackluster manner. They did not raise it as one of the legal issues the parties stipulated would be addressed at trial (Doc. No. 430). But they did raise it in an oblique way in their response to the Chapter 7 trustee's Second Amended Complaint, by asserting that Africh Maintenance "was a bona fide purchaser for value." (Doc. No. 96 in 04–ap–79). Nonetheless, to be thorough, the Court will address their possible good faith defense.

**130.** Fla. Stat. § 726.109(1).

**131.** *Perlman v. Delisfort–Theodule,* No. 09–80480–CIV, 2010 WL 4514249, at *2 (S.D.Fla. Nov.2, 2010).

**132.** *Wiand v. Waxenberg,* 611 F.Supp.2d 1299, 1319–20 (M.D.Fla.2009).

make inquiry, and which inquiry, if made with reasonable diligence, would have led to the discovery of the [transferor's] fraudulent purpose."[133] A transferee does not take property in good faith when the transferee is on notice of at least some of the transferor's fraudulent actions.[134]

■ While the Court declines to make any finding as to the PITA Assets' value,[135] the Court does find Africh did not buy the PITA Assets in good faith. At the time of the transfer, Africh knew the following: (1) SWC was insolvent and facing conversion; (2) the PITA Assets were SWC's most valuable asset; (3) SWC's confirmed plan of reorganization contemplated paying certain classes of creditors with the proceeds of a liquidation sale of the PITA Assets; (4) under the plan, Africh's and AM & I's general unsecured claims were *not* one of these classes and therefore were likely worthless; (5) Fox was still a personal friend and business colleague; and (7) Fox, through FOSCO, retained the ability to further profit from the PITA Assets upon a resale equal to 80% of the purchase price exceeding $400,000. In sum, Africh bought the PITA Assets in obvious bad faith because he knew exactly what Fox was up to and did it anyway, hoping to quickly double his $200,000 investment on the resale of the PITA Assets. Africh was hoping to maximize his recovery, knowing he and his companies would receive next to nothing in SWC's converted Chapter 7 case and to help his friend Fox cheat SWC's other creditors.

Because Africh did not purchase the PITA Assets in good faith, he cannot rely on the good faith defense of Florida Statute § 726.109(1). The transfer is avoided in its entirety. Under § 550 of the Bankruptcy Code, when a transfer is avoided under § 544(b) and applicable state law like Florida Statute § 726.105, the Chapter 7 trustee is allowed to recover either the asset itself or its reasonably equivalent value. Here, because the value is uncertain, return of the asset to the Chapter 7 trustee is the only reasonable remedy. Accordingly, as requested in Counts VI and VII of the Second Amended Complaint, the Chapter 7 trustee is entitled to recover the PITA Assets from the Africh Defendants and anyone else in possession thereof, including Vintage Partners and Funding Solutions. Furthermore, under the settlement reached with the Jasgur Estate, the Chapter 7 trustee is also entitled to recover any other portion of the larger Jasgur Collection held anywhere by any other entity or transferee.

### CHAPTER 5: The Chapter 7 Trustee is Not Otherwise Entitled to Relief

The Chapter 7 trustee, in her Second Amended Complaints in both adversary proceedings, pursued several other theories to recover the PITA Assets from the Africh Defendants, but none is a valid ground for recovery. Her unsuccessful theories include: (1) that the sale was a fraudulent pre-petition transfer under § 548 of the Bankruptcy Code (Count IV and V in 04–79); (2) the sale was an unau-

---

**133.** *Id.* at 1319 (*quoting United States v. Romano*, 757 F.Supp. 1331, 1338 (M.D.Fla. 1989)).

**134.** *WRJ Development, Inc., v. North Ring, Ltd.*, 979 So.2d 1046 (Fla. 3d DCA 2008).

**135.** The Court gives no credence to any of the estimated values of the PITA Assets offered by any party. Michael Heffher, an appraiser working with a memorabilia auctioneer, was the only valuation expert who testified. He estimated the PITA Assets were worth $115,000 when Africh Maintenance bought them in 2003, and are worth $200,000 to $250,000 at present. Heffher's testimony was not credible. He examined only a small portion of the PITA Assets, and much of what he inspected were copies and not originals.

thorized post-petition transfer under § 549 of the Bankruptcy Code (Count III in 04–79); (3) turnover of property of the estate under § 542(b) against all defendants (Count VII in 04–77); (4) the sale exceeded the scope of SWC's confirmed plan (Count XI [136] in 04–79); (5) the Court should impose a constructive trust for SWC's creditors (Count X in 04–79); (6) breach of contract against Vintage Partners and Funding Solutions (Counts IV and VI in 04–77); and (7) turnover of property of the estate under § 542(b) against Vintage Partners (Count V in 04–77). The Court will address each in turn.

[25] The Chapter 7 trustee's fraudulent transfer claim under § 548 of the Bankruptcy Code fails because § 548 applies only to transfers made pre-petition. The PITA Assets were transferred more than two years *after* SWC filed its petition, and conversion to a Chapter 7 case does not change the petition date.[137]

[26] The Chapter 7 trustee's theory that the sale violated § 549 also fails because she cannot show that a post-petition transfer of *property of the estate* was not authorized by the Code or the Court.[138] After the Court confirmed SWC's plan of reorganization, the PITA Assets were no longer property of the estate. Although the PITA Assets were once part of the debtor's estate, when the Court confirmed the Chapter 11 plan on August 21, 2002, all property of the estate vested in the reorganized SWC both under the terms of the plan [139] and under § 1141(b). The PITA Assets therefore were no longer property of the estate when Fox sold them to Africh Maintenance on March 31, 2003. Converting the case to Chapter 7 did not bring them back into the estate.[140]

■■■ The Chapter 7 trustee's claims for turnover of property of the estate under § 542(b) fail for the same reason: the PITA Assets were no longer property of the estate when they were sold.[141] Section 542(b) provides "an entity that owes a debt to the debtor that is property of the estate and that is matured, payable on demand, or payable on order" must turn over the property to the Chapter 7 trustee. But here, the PITA Assets ceased being property of the estate when the Court confirmed the Chapter 11 plan on August 21, 2002, so the Chapter 7 trustee cannot compel their turnover under § 542(b).

■■■ Next, because the confirmed plan contemplated selling the PITA Assets for the benefit of SWC's creditors, their sale did not exceed the scope of the plan.

---

136. This Count is mislabeled as Count IX in the Chapter 7 trustee's Second Amended Complaint.

137. Bankruptcy Code § 348(a); *see also Hoffman v. Cheek*, 90 B.R. 21, 24 (D.Conn.1988); *In re Florida Consumer's Furniture Warehouse, Inc.*, 9 B.R. 7, 9 (Bankr.Fla.1981); *In re State Airlines, Inc.*, 873 F.2d 264, 269 (11th Cir.1989) (explaining § 348(a) "expressly states that the date of the petition remains *unchanged*") (emphasis original). Though § 348(b) provides, in a case converted under § 1112(b), the conversion order constitutes the "order for relief," § 348(b) does not change the "date of the filing of the petition" as provided in § 548.

138. *In re Russell*, 927 F.2d 413, 417–18 (8th Cir.1991).

139. Ex. 14, p. 9.

140. *See, e.g., In re T.S.P. Industries, Inc.*, 117 B.R. 375 (Bankr.N.D.Ill.1990); *In re T.S.P. Industries, Inc.*, 120 B.R. 107 (Bankr.N.D.Ill. 1990); *In re T.S. Note Co.*, 140 B.R. 812 (Bankr.D.Kan.1992).

141. The Chapter 7 trustee cited § 542(b) and § 542(a) in the same Count. Regardless of which provision on which she relies, this Count fails because both provisions require the property the trustee seeks to recover to be property of the estate.

Unlike the *Hiller* case the Chapter 7 trustee cited,[142] the plan did not require that SWC sell the PITA Assets for any particular amount. SWC's use of the sale proceeds violated the plan and constituted actual fraud, but that is irrelevant to whether the sale itself was authorized. A confirmed plan is effectively a new contract between a debtor and its creditors,[143] so SWC's failure to distribute the proceeds of the sale according to the terms of the plan is a breach of contract issue that could have been brought by creditors.[144] But this alone does not allow the Chapter 7 trustee to undo the sale.

■■■ The Court also will not impose a constructive trust on the PITA Assets because there was no abuse of a confidential relationship that resulted in unjust enrichment.[145] While Africh and Fox were social friends and had done business together, they did not have the kind of intimate relationship required for the Court to impose a constructive trust. The Africh Defendants did not abuse their relationship to take advantage of an unwitting SWC or Fox who stood to benefit from a future sale of the PITA Assets. Indeed, the two men, as discussed above, were in agreement between themselves that they would both personally benefit at the expense of SWC's other creditors. A constructive trust is not merited.

Finally, the Chapter 7 trustee cannot prevail on her breach of contract counts against Vintage Partners and Funding Solutions nor her concomitant turnover count against Vintage Partners, because she failed to meet her burden to show either party breached a contract. The Chapter 7 trustee contends both parties breached contracts [146] that required returning whatever portions of the PITA Assets they had in their possession.[147] But the Chapter 7 trustee did not present any evidence that would conclusively establish whether either party failed to return any items they might have possessed. The Chapter 7 trustee testified she recovered some items from both Vintage Partners and Funding Solutions, but the record is not clear what specific items the parties once had, or eventually returned to PITA, SWC, Africh, or the Chapter 7 trustee. Because the Chapter 7 trustee did not meet her burden, these counts fail.

### EPILOGUE

To summarize, the Court finds in favor of the Chapter 7 trustee on Count III

---

142. *In re Hiller*, 143 B.R. 263 (Bankr.D.Colo. 1992).

143. *In re Dow Corning Corp.*, 456 F.3d 668, 676 (6th Cir.2006).

144. Under the plan, the creditors that should have benefited from liquidation of the PITA Assets were Vicki Whitman, Central Mechanical, d/b/a Central Construction, and Cox Concrete. Exs. 14, p. 6; 16, p. 3–4.

145. A constructive trust is an extraordinary remedy that a court will impose to prevent unjust enrichment resulting from fraud. Often the fraud occurred as a result of the abuse of a confidential relationship. *In re Woolum*, 279 B.R. 865, 869–870 (Bankr.M.D.Fla.2002). A confidential relationship is not limited to parent/child, attorney/client, doctor/patient and other comparable relationships, but there must be *some* showing of a similarly intimate relationship between the parties. *Claycomb v. Combs*, 676 So.2d 523, 524 (Fla. 2d DCA 1996).

146. Exs. 101, 102, 131, 134.

147. Vintage Partners' termination agreement is governed by Florida law; the Chapter 7 trustee has the burden to establish a breach of contract by the greater weight of the evidence. *J.S.L Const. Co. v. Levy*, 994 So.2d 394, 401 (Fla. 3d DCA 2008). The Funding Solutions' contract is governed by Connecticut law; the Chapter 7 trustee has the burden to establish a breach of contract by a preponderance of the evidence. *Waicunas v. Macari*, 151 Conn. 134, 137, 193 A.2d 709(1963).

(Declaratory Relief) of her Second Amended Complaint in Adversary Proceeding 04–77 and holds that the debtor, SWC, owned the PITA Assets free and clear of all liens as of February 12, 2002. The Court then finds in favor of the Chapter 7 trustee on Count VII (Actual Fraudulent Transfer under Fla. Stat. § 726.105(1)(a)) of the Second Amended Complaint in Adversary Proceeding 04–79, holding the transfer of the PITA Assets to Africh was an avoidable fraudulent transfer under Bankruptcy Code § 544(b) and Florida Statute § 726.105(1)(a). Accordingly, the Court also grants Count VI seeking recovery from the Africh Defendants under Bankruptcy Code § 550. Therefore, under both § 550 and the settlement agreement with the Jasgur Estate, the Chapter 7 trustee is entitled to turnover of the PITA Assets from the Africh Defendants and anyone else currently in possession of the PITA Assets or the larger Jasgur Collection. The Court finds in favor of defendants on all other counts of the Chapter 7 trustee's complaints for the reasons specified herein.

A separate order consistent with this memorandum opinion will be entered simultaneously.

DONE AND ORDERED.

*Appendix A*

The Court finds that the ownership of PITA was as follows:

| Certificate number | Certificate owner | Number of shares issued | Transfers, if any | Ownership from 11/21/1998 to 2/12/2002 |
|---|---|---|---|---|
| 1 | Kathy Lindgren | 1,000 | Sold to Diana Williamsen on 8/9/1998; sold to PITA on 11/21/1998 | PITA |
| 2 | Paul Williamsen | 500 | Sold to Diana Williamsen on 8/11/1998; sold to PITA on 11/21/1998 | PITA |
| 3 | Vern Williamsen | 500 | Sold to Diana Williamsen on 8/11/1998; sold to PITA on 11/21/1998 | PITA |
| 4 | Phillip Miller | 500 | Sold to Diana Williamsen on 8/10/1998; sold to PITA on 11/21/1998 | PITA |
| 5 | Peter Miller | 500 | Sold to Diana Williamsen on 8/10/1998; sold to PITA on 11/21/1998 | PITA |
| 6 | SWC | 3,250 | | SWC |
| 8 | Laura Miller | 50 | Sold to Diana Williams on August 9, 1998; sold to PITA on 11/21/1998 | PITA |
| 10 (replaced lost stock certificate # 7). | Gail A. Williamsen | 1,250 | Sold to SWC on 9/9/1998 | SWC |
| 14 | Diana Williamsen | 11,000 | Sold to PITA on 11/10/1998 | PITA |
| 15 | Diana Williamsen as trustee for the Irrevocable Children's Trust | 11,000 | Sold to PITA on 11/21/1998 | PITA |